# ST. JOSEPH STOCK YARDS CO. v. UNITED STATES ET AL.

No. 497. Argued March 2, 1936.—Decided April 27, 1936.

40

*Mr. Ross Dean Rynder,* with whom *Mr. William N. Strack* was on the brief, for appellant.

*Assistant Attorney General Dickinson,* with whom *Solicitor General Reed* and *Messrs. Wendell Berge, J. Stephen Doyle, Jr.,* and *G. N. Dagger* were on the brief, for the United States et al.

42

44

Mr. Chief Justice Hughes delivered the opinion of the Court.

This suit was brought by St. Joseph Stock Yards Company to restrain the enforcement of an order of the Secretary of Agriculture fixing maximum rates for the Company's services. The District Court, composed of three judges, dismissed the bill of complaint, 11 F. Supp. 322, and appeal lies directly to this Court. 7 U. S. C. 217; 28 U. S. C. 47.

In October, 1929, the Secretary of Agriculture initiated a general inquiry into the reasonableness of appellant's rates. After hearing, the Secretary prescribed maximum rates which were enjoined by the District Court. *St. Joseph Stock Yards Co.* v. *United States,* 58 F. (2d) 290. The Secretary reopened the proceeding and hearing was had in 1933. While the matter was under consideration, appellant filed in February, 1934, a petition for a further hearing. On May 4, 1934, the Secretary denied the petition and made the order now in question.

The validity of the provisions of the Packers and Stockyards Act, 1921 (42 Stat. 159, 7 U. S. C. 181–229) authorizing the Secretary of Agriculture to prescribe maximum charges for the services of stock yards has been sustained. *Stafford* v. *Wallace,* 258 U. S. 495; *Tagg Bros. & Moor-*

*head.* v. *United States,* 280 U. S. 420. In this suit, appellant attacked the Secretary's order as lacking the support of essential findings, and also as confiscatory, thus violating the Fifth Amendment of the Federal Constitution. The denial of the request for a further hearing was assailed. No additional evidence was introduced in the District Court and the case was submitted at the final hearing upon the record made before the Secretary.

*First.—The Secretary's findings.—*The findings are elaborate. They include detailed findings with respect to the services rendered by appellant and its rates, the used and useful character of appellant's property, the valuation of used and useful land, the value of appellant's structures on the basis of cost of reproduction new less depreciation, working capital, going concern value, fair value on the basis of the facts found, fair rate of return, reasonable operating expenses (including repairs, depreciation and taxes), necessary revenue and volume of business. The Secretary found that the existing rates produced revenues in excess of those necessary to pay reasonable expenses and afford a fair return; that "the schedule of rates and charges now in effect is unreasonable and unjustly discriminatory."

As a guide to his determination of reasonable rates, the Secretary caused an analysis to be made of the books and records of the appellant covering the six-year period from 1927 to 1932. He reached his conclusion in the light of that evidence. Appellant contends that, as a prerequisite to a reduction of rates, it was necessary for the Secretary to find that the rates were unreasonable "at the time of the hearing," and that there were no findings to support such a conclusion with respect to the year 1932, the year immediately preceding the hearing. But in determining whether the existing rates were unreasonable, the Secretary was not confined to evidence as to

their operation at the precise time of his hearing, or in the months, or even a year, immediately prior thereto. He was entitled to consider the conditions which then obtained and also to extend his examination over such a reasonable period of past operations as would enable him to make a fair prediction in fixing the maximum rates to be charged in the future. The Secretary had before him the particular conditions which prevailed in the year 1932; and in the selection of the six-year period including that year, and in not taking the year 1932 as a sole criterion, we find nothing arbitrary. There are also objections to the failure of the Secretary to make specific findings on certain points of fact, but, so far as the requirement of findings is concerned, we think that the extensive findings that were made adequately supported his order.

*Second.—The refusal of the Secretary to reopen the proceeding.*—The hearing was closed on February 16, 1933. In the following January, a copy of the proposed order was transmitted to counsel for appellant and opportunity was given to file exceptions. Numerous exceptions were filed and at the same time (February, 1934) appellant asked for a further hearing upon the ground that there had been such a serious change in conditions affecting the value of the Company's property, its income, and the probable receipts of live stock and expenses of its yards, that the record no longer fairly reflected these matters. The application pointed to the Agricultural Adjustment Act of May 12, 1933, the National Industrial Recovery Act of June 16, 1933, and the Gold Reserve Act of January 30, 1934,—all as producing changes of which account should be taken. Appellant also alleged that its books and records were available to give the complete results of its operations for the year 1933, which showed a lower net operating income than that stated in the Secre-

tary's proposed report. The Secretary heard argument, made an informal investigation, and denied the application. He was careful to say that, while as a result of his investigation he found no adequate ground for reopening the proceeding, he did not use the facts thus elicited as a part of the record upon which his determination of rates was based. After stating what he deemed to be comparative results of operations in 1933, and in January and February, 1934, the Secretary gave as the general grounds for his action that it was inevitable that in such determinations considerable time must be consumed and that there would be some economic change; that appellant had obtained one rehearing because the first hearing had been followed by a general business depression which adversely affected its gross revenues; that it sought another because since the last hearing there had been a general improvement in those conditions; that in determining the values used as a rate base, "depression or stagnation values" had carefully been avoided and "normals" used; that the prescribed rates which the Secretary deemed to be fair at that time would "as the economic improvement continues, become liberal"; that the matter had been "in hearing and litigation since the year 1929" and the time had come for decision.

The decree of the District Court was filed on May 1, 1935. Despite the opportunity which the suit afforded, the record shows no endeavor on the part of appellant to prove any additional facts as to the conditions which obtained in 1933, or as to its operations in that year or at any time down to the hearing in the District Court, or as to any matter outside the record which had been made before the Secretary. The court concluded that the effect of the legislation of 1933 was speculative; that the difference between the amount which appellant claimed would have been earned under the prescribed rates, if applied to the business of 1933, and the amount found by

the Secretary to constitute the reasonable net return, was "too small to be taken as a guide for a rate"; that in order "to gauge the future," the Secretary had taken six years, "two of which were deeply affected by the depression," and that the experience before the Secretary "was up to ten days before the date of the hearing." In that view the court decided that the proceeding should not be reopened and that the question of the effects urged by appellants in that relation should await the test of actual experience upon which, if sufficient reasons were shown, the Secretary's order could be challenged. 11 F. Supp. p. 325. We find no error in that conclusion. If it be found that the rates as prescribed were not confiscatory, we see no reason for holding the Secretary's order to be ineffective because of his refusal to reopen the proceeding. *United States* v. *Northern Pacific Ry. Co.*, 288 U. S. 490.

*Third.*—*The scope of judicial review upon the issue of confiscation.*—The question is not one of fixing a reasonable charge for a mere personal service subject to regulation under the commerce power, as in the case of market agencies employing but little capital. See *Tagg Bros. & Moorhead* v. *United States, supra*, pp. 438, 439. Here, a large capital investment is involved and the main issue is as to the alleged confiscation of that investment.

A preliminary question is presented by the contention that the District Court, in the presence of this issue, failed to exercise its independent judgment upon the facts. 11 F. Supp. pp. 326–328. See *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U. S. 287, 289; *Prendergast* v. *New York Telephone Co.*, 262 U. S. 43, 50; *Bluefield Water Works Co.* v. *Public Service Comm'n*, 262 U. S. 679, 689; *United Railways* v. *West*, 280 U. S. 234, 251; *Tagg Bros. & Moorhead* v. *United States, supra*, pp. 443, 444; *Phillips* v. *Commissioner*, 283 U. S. 589, 600; *Crowell* v. *Benson*, 285 U. S. 22, 60; *State Corporation Comm'n* v. *Wichita Gas*

*Co.,* 290 U. S. 561, 569. The District Court thought that the question was still an open one under the Packers and Stockyards Act, and expressed the view that, even though the issue is one of confiscation, the court is bound to accept the findings of the Secretary if they are supported by substantial evidence and that it is not within the judicial province to weigh the evidence and pass upon the issues of fact. The Government points out that, notwithstanding what was said by the court upon this point, the court carefully analyzed the evidence, made many specific findings of its own, and in addition adopted, with certain exceptions, the findings of the Secretary. The Government insists that appellant thus had an adequate judicial review and, further, that the case is in equity and comes before the court on appeal, and that from every point of view the clear preponderance of the evidence shows that the prescribed rates were in fact just and reasonable. Hence, the Government says that the decree should be affirmed irrespective of possible error in the reasoning of the District Court. See *West* v. *Chesapeake & Potomac Telephone Co.,* 295 U. S. 662, 680.

In view, however, of the discussion in the court's opinion,[1] the preliminary question should be considered. The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards.

---

[1] See, also, *Denver Union Stock Yard Co.* v. *United States,* 57 F. (2d) 735, 739; *St. Joseph Stock Yards Co.* v. *United States,* 58 F. (2d) 290, 295; *Union Stock Yards Co.* v. *United States,* 9 F. Supp. 864, 875; *American Commission Co.* v. *United States,* 11 F. Supp. 965, 969.

The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 446; *Minnesota Rate Cases,* 230 U. S. 352, 433; *Los Angeles Gas Corp. v. Railroad Commission,* 289 U. S. 287, 304. When the legislature itself acts within the broad field of legislative discretion, its determinations are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. *Interstate Commerce Comm'n v. Louisville & Nashville R. Co.,* 227 U. S. 88, 91; *Virginian Ry. Co. v. United States,* 272 U. S. 658, 663; *Tagg Bros. & Moorhead v. United States, supra,* p. 444; *Florida v. United States,* 292 U. S. 1, 12. In such cases, the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.

But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent juris-

diction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. This is the purport of the decisions above cited with respect to the exercise of an independent judicial judgment upon the facts where confiscation is alleged. The question under the Packers and Stockyards Act is not different from that arising under any other act, and we see no reason why those decisions should be overruled.

But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that "in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing." *Darnell* v. *Edwards*, 244 U. S. 564, 569. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. *Los Angeles Gas Corp.* v. *Railroad Commission*, 289 U. S. 287, 305; *Lindheimer* v. *Illinois Telephone Co.*, 292 U. S. 151, 169; *Dayton Power & Light Co.* v. *Public Utilities Comm'n*, 292 U. S. 290, 298.

A cognate question was considered in *Manufacturers Ry. Co.* v. *United States*, 246 U. S. 457, 470, 488–490. There, appellees insisted that the finding of the Interstate Commerce Commission upon the subject of confiscation was conclusive, or at least that it was not subject to be attacked upon evidence not presented to the Commission. We did not sustain that contention. Nevertheless, we

pointed out that correct practice required that "in ordinary cases, and where the opportunity is open," all the pertinent evidence should be submitted in the first instance to the Commission. The Court did not approve the course that was pursued in that case "of withholding from the Commission essential portions of the evidence that is alleged to show the rate in question to be confiscatory." And it was regarded as beyond debate that, where the Commission after full hearing had set aside a given rate as unreasonably high, it would require a "clear case" to justify a court, "upon evidence newly adduced but not in a proper sense newly discovered," in annulling the action of the Commission upon the ground that the same rate was so unreasonably low as to deprive the carrier of its constitutional right of compensation. With that statement, the Court turned to an examination of the evidence. The principle thus recognized with respect to the weight to be accorded to action by the Commission after full hearing applies *a fortiori* when the case is heard upon the record made before the Commission or, as in this case, upon the record made before the Secretary of Agriculture. It follows, in the application of this principle, that as the ultimate determination whether or not rates are confiscatory ordinarily rests upon a variety of subordinate or primary findings of fact as to particular elements, such findings made by a legislative agency after hearing will not be disturbed save as in particular instances they are plainly shown to be overborne.

As the District Court, despite its observations as to the scope of review, apparently did pass upon the evidence, making findings of its own and adopting findings of the Secretary, we do not think it necessary to remand the cause for further consideration and we turn to the other questions presented by the appeal.

*Fourth.—Valuation of property, income, expenses, and fair return.*—The Secretary found the fair value of ap-

pellant's property, used and useful in its stock-yards service, to be $2,743,000. The District Court made certain additions of land which the Secretary had excluded from his appraisal, arriving at a rate base of $2,752,964. The Secretary found seven per cent. to be a reasonable rate of return, which would mean net earnings of $192,010 on his rate base, or $192,710 on that of the court below. The Secretary estimated that under the prescribed rates appellant's net income available for return upon its investment would be $195,564 or 7.13 per cent. on his valuation.

Elaborate briefs have discussed a host of details in attacking and defending these estimates. While we have examined the evidence and appellant's contentions on each point, it is impracticable to attempt in this opinion to state more than our general conclusions.

1.—*Property values.*—For the purpose of demonstrating that its rates were not unreasonable prior to 1932, appellant states that it adopts the findings of the Secretary in his first decision as to the total value of its property. That value was then fixed at $3,382,148; to which appellant adds the value of certain additional land now found to be used and useful, $329,163, giving a total value, which appellant says is applicable to the years 1927-1931, of $3,711,311. But the first hearing was begun and concluded in December, 1929, and while the order was not promulgated until July 20, 1931, it was predicated, as the District Court said in reviewing that order, upon the value of the property as of the year 1928 and the volume of business during that year. *St. Joseph Stockyards Co.* v. *United States,* 58 F. (2d) p. 291. Appellant insisted in its bill of complaint in the first suit that the Secretary's denial of its request for reopening was arbitrary, as economic conditions had materially changed since 1928. The District Court, applying the principle of our decision in *Atchison, T. & S. F. Ry. Co.* v. *United States,* 284 U. S.

248, held that a rehearing should have been granted, 58 F. (2d) pp. 296, 297. The Secretary then vacated his prior order and reopened the proceeding. There is no question of *res judicata*. *Tagg Bros. & Moorhead* v. *United States*, *supra*, p. 445; compare *Clark's Ferry Bridge Co.* v. *Public Service Comm'n*, 291 U. S. 227, 233. Appellant could not obtain an examination of the changed conditions with respect to its income and outlays in the period after 1928 and at the same time insist that the change in values due to the depression should be ignored.

Appellant provides the physical facilities for a market and renders various services in connection with livestock. It supplies office buildings, docks for loading and unloading, "chute pens," "sales pens" and alleys, and the various appurtenances for the proper care of livestock that are essential to its service in warehousing. The property thus consists of land and various structures.

*Value of land.*—The Secretary found that of the land owned by appellant there were 4,410,361 square feet used and useful in its stockyards services. The District Court added 122,041 square feet. 11 F. Supp. 336. Appellant complains, on this appeal, of the exclusion of the property known as the "Transit House" and of the value assigned to the property which was included in the rate base.

The "Transit House" is a commercial hotel (occupying 15,805 square feet of land) with a limited patronage supplied by shippers and drivers of trucks. Appellant claims that the land and building are worth $120,143. Appellant points to the ruling of the Secretary in the first proceeding that the hotel should be considered a part of the used and useful property in the stockyards service. In his second decision, now under review, the Secretary found that the hotel was constructed many years ago when transportation facilities between the stockyard area and the "main-uptown" area were limited; that at the time of the first hearing the hotel was leased for a rental

of $1200 a year, and that the business had not warranted an increase, as provided in the lease, up to the time of the second hearing; that the decadence of the property had resulted principally from the development of good roads and the use of motor vehicles and the street car system of the city of St. Joseph, as well as from the change in the method of marketing livestock. It did not appear that the hotel produced enough revenue to pay taxes, insurance and upkeep, to say nothing of a return on its alleged value, and it is plain that if its value were to be included in the rate base the effect would be to levy an annual charge upon the patrons of the yards, principally the original shippers, in order to maintain hotel facilities on a non-compensatory basis for the special benefit of the truck drivers and others who patronized it.

The District Court held that it would have to be shown very clearly that the business of the yards would be materially affected by the absence of a nearby hotel before it could be said that its maintenance was so related to the stockyards business as to be properly included in fixing the rate for yard services. The court said that there was no such showing. We take the same view.

The land found to be used and useful is divided into several zones. Appellant assigns error in valuation only in the case of Zone A, in which, however, 70 per cent. of the used and useful land, or 3,003,973 square feet, is included. The Secretary valued this land at 16 cents per square foot, or at $480,635. Appellant contends that it is worth at least $275,164 more, which would be at the rate of about 25 cents a square foot.

Expert witnesses for both parties testified at length. At the first hearing, in 1929, two witnesses for appellant valued the land in Zone A at 30 cents per square foot. The witness for the Government valued it at 35 cents, predicated upon its particular value for stockyard use; otherwise at 20 cents. Before the second hearing, in 1933,

two of these witnesses had died. The surviving witness for appellant again testified giving a value, as of August, 1932, of 26 cents per square foot, and a second witness for appellant thought it worth 35 cents. The new witness for the Government placed the value as of November, 1932, at $5000 an acre, or about 11½ cents per square foot.

All the witnesses were highly qualified experts. Their valuations were of the naked land, without improvements. The three witnesses at the second hearing had collaborated in examining about 147 different transactions relating to property in the general vicinity, but they reached independent conclusions. The Government's witness attached special weight to five sales, or groups of sales, made at different times from 1918 to 1930 at prices as low or lower than the valuation he fixed. Appellant points to other transfers at other locations at higher prices. Manifestly these transactions involved collateral inquiries and in the end simply afforded information of varying significance to aid the forming of an expert judgment. Appellant recognizes the impracticability of attempting to analyze "the rather involved transfers and locations in an attempt to determine the truth as between the land appraisers." Accordingly, appellant seeks to demonstrate that the Secretary's finding is vitiated by what is asserted to be his reliance upon an erroneous analysis of a sale by appellant, in 1929, of the entire capital stock of a terminal belt railway company which served the stockyards and the adjacent industrial area. It is said that none of the expert witnesses based their appraisals upon that transaction. We think that appellant overestimates the relative weight given to it by the Secretary and fails to take proper account of the effect of its use. The Secretary found that the valuation by the Government's witness at 11½ cents per square foot was "well supported by analysis of transactions in adjacent

and similar lands," but the Secretary thought that the witness had failed to give consideration to the belt railway sale. That led the Secretary to give a higher valuation than that of the Government's witness. And on all the evidence the Secretary fixed the value at 16 cents per square foot, which he said did not represent "depression or stagnation value" but constituted "the reasonable normal value of the land giving weight to values existing immediately preceding as well as those existing during the present depression."

The weight to be accorded to the testimony of the experts cannot be determined without understanding their approach to the question and the criteria which governed their estimates. The testimony of appellant's witnesses shows quite clearly that they proceeded, in part at least, upon an erroneous basis. The Packers and Stockyards Act treats the various stockyards of the country "as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East." It assumes that "they conduct a business affected by a public use of a national character and subject to national regulation." Stafford v. Wallace, supra, p. 516. Appellant, conducting such a business, was entitled to be allowed in the fixing of its rates the fair market value of its land for all available uses and purposes, which would include any element of value that it might have by reason of special adaptation to particular uses. But it was not entitled to an increase over that fair market value by virtue of the public use. Minnesota Rate Cases, 230 U. S. 352, 451, 455; Clark's Ferry Bridge Co. v. Public Service Comm'n, supra, p. 238. We think that appellant's witnesses failed to give proper heed to this principle. Their testimony indicates that they did not consider simply the availability of the land for all uses and purposes, including its availability for a stockyard, but attached special weight to the actual and profitable public

use. They apparently included in their estimates an increment of value, by virtue of that use, which is inadmissible in a proceeding to determine the reasonable rates to be charged for the public service.

The point is illustrated by the difference in their estimate of the value of the land in Zone B. That is a tract of about seventeen acres adjoining Zone A. One of appellant's witnesses described the land in Zone B as "of the same character" as that occupied by appellant's hog sheds and that it had equal railroad service. It was said to adjoin that portion of appellant's land which "is actively used in the conduct of its business." The other witness for appellant said that "with respect to topography, rail service and accessibility this ground is much the same as Zone A, which lies immediately to the north." But the first witness placed a value of 13 cents per square foot on the land in Zone B as compared with 26 cents per square foot on that of Zone A, and the second witness valued the former at 15 cents per square foot and the latter at 35 cents. The first witness said that Zone B was not valued as high as Zone A because "it is not actually in use" by appellant "for the immediate conduct of its business but is in waiting"; that it "had not been brought into its highest and best use," but when it had been brought into that use, it would "be worth just as much as the land in tract A." When we consider that the question was of the fair market value of the bare land in the light of its availability, but without improvements (which were separately valued), the erroneous theory on which appellant's witnesses valued Zone A is apparent. The Secretary fixed the value of the land in Zone A and the similarly available land in Zone B at the same amount.

Our conclusion is that the evidence falls short of that convincing character which would justify us in disturbing the Secretary's finding.

*Value of structures.*—There appears to be no dispute as to the method of valuation, which was on the basis of cost of reproduction new, less depreciation. The property was inventoried and appraised independently by two qualified engineers, one employed by appellant and the other by the Government. Their estimates of the cost of reproduction new were not very far apart. On that evidence the Secretary found that cost, excluding non-useful property, to be $2,637,186. This included construction overheads, general salaries and expenses, legal expenses, compensation of architects and engineers, fire and tornado insurance, workmen's compensation and public liability insurance, and taxes during construction, making a total of $2,494,043, on the 1927 inventory, which was increased by $143,143 for the additions and betterments to 1932.

Appellant presents no contention as to this valuation but contests the amount deducted by the Secretary for existing depreciation. He took 76.04 per cent. of the cost of reproduction new as representing the depreciated value of the structures and thus his deduction amounted to $597,570. That was close to the estimate of the Government's engineer. Appellant's engineer testified that the present condition was 89 per cent.

Appellant's contention is that there was no evidence to support the Secretary's deduction for existing depreciation and that the only legal evidence on this point was that of appellant's witness. The precise criticism is that the percentage used by the Government's engineer in his testimony was based on an average of percentages given by five of his assistants, none of whom testified. It appears, however, that the Government's witness had personally inspected the property in preparation for the first hearing, at which he testified as to the result of the inspection and the methods he adopted. At the second hearing he testified that he followed the principles of his first

appraisal in that of 1932, except that he had his five assistant engineers make separate estimates of which he took the average. In answer to appellant's contention as to their failure to testify, the Government produces a stipulation as to the record which shows that when the exhibits covering the appraisal by the Government's witness and the estimates of the assistants were offered in evidence, the Government's counsel stated that if there was any objection upon the ground that they had not testified, the Government would produce any or all of them for cross-examination respecting the exhibits. Later, after an opportunity for an examination of the exhibits by appellant's counsel, they were received in evidence, appellant's counsel stating that no objection was made other than the general one theretofore made, and applicable throughout the proceeding, that the Secretary had no power to find the value of appellant's property. Appellant did not seek to avail itself of the Government's offer to produce the assistants. In these circumstances we find no basis for the argument that the testimony of the Government's witness as to the existing depreciation and the accompanying exhibits should not be considered. The Secretary reviewed the method adopted by appellant's engineer as compared with that of the Government's engineer and reached a reasoned conclusion upon all the evidence. We think that the evidence affords no sufficient ground for upsetting his finding.

The remaining contention affecting the rate base is in relation to going concern value.

*Going concern value.*—Appellant's witness, who testified at length at both hearings, followed an elaborate method involving assumptions and speculations of the sort which fail to furnish a sound basis for computing a separate allowance for that element. Compare *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 394; *Los Angeles*

*Gas Corp.* v. *Railroad Commission, supra,* pp. 314, 318, 319; *Dayton Power & Light Co.* v. *Public Utilities Comm'n,* 292 U. S. 290, 309; *Columbus Gas & Fuel Co.* v. *Public Utilities Comm'n,* 292 U. S. 398, 412. The witness differentiated his method from the "past deficit" method. *Galveston Electric Co.* v. *Galveston, supra.* He styled his method as "the cost of reproduction method of evaluating the business." It compared "to the past deficit method in just exactly the same way that reproduction new of physical property compares to historical cost of physical property." His calculations depended upon assumptions of theoretical future deficits. They involved elaborate guesswork, according to assumed valuations of physical plant, the length of time required for the complete recovery of the business, and the rate of return. At the first hearing he computed the going concern value at $666,666. At the second hearing, by a similar method he made various calculations dependent on assumed valuations of the property, that is, $294,000 on a total valuation of $5,000,000; $358,000 on a valuation of approximately $3,500,000; and about $400,000, or approximately 22½ per cent. of the physical plant value, on a valuation of $2,000,000. That is, as he said, "Depending upon the final value as fixed by the Secretary, the going value will range in approximately a straight line variation" between the limits "of 22½ per cent. for a minimum value of $2,000,-000, and 6 per cent. or $294,000 for a maximum value of $5,000,000." The Secretary treated such speculations as "in no real sense evidence." We agree with that conclusion.

Appellant contends, however, that the Secretary and the District Court erred in saying that appellant's claim is based wholly upon the testimony of this witness. Appellant strongly relies upon the fact that on the first hearing the Secretary made an allowance of $300,000 for

going concern value and that in his answer in the first suit he denied that no evidence upon that subject had been offered on the Secretary's behalf, but on the contrary stated that much evidence was introduced by the Secretary tending to show the value of that element. That answer was made to the allegation that appellant was entitled to an allowance of at least $666,663, and the Secretary further answered that the separate allowance he had made was more than adequate.

The Secretary was not estopped or controlled by the ruling in the first proceeding. He was entitled, and it was his duty, to re-examine the case on the second hearing and to reach the conclusion which the evidence justified. In that process, he in effect overruled the earlier allowance and left it without force. The question remains one of evidence. The Secretary recognized the fact that there is an element of value in an "established plant doing business and earning money over one not thus advanced." But he thought that in the rate base he had fixed there was an adequate allowance for that element and that it was "inextricably interwoven with other values." The Government's argument in support of this view points to the overheads allowed and emphasizes the fact that the Secretary's method took as his basis reproduction cost "unmodified by considerations of actual or historical cost." It is urged that the Secretary in fact made a liberal valuation which gave a margin large enough to cover the value inherent in a going concern.

We think it unnecessary to review that argument in detail. The decisive point on this appeal is that in seeking a separate allowance for going concern value, in addition to the value of the physical plant as found, and in maintaining that the property was being confiscated because of the absence of that allowance, it was incumbent upon appellant to furnish convincing proof. That proof we do not find in the record.

*Operating expenses.*—The point of contention is the annual allowance for depreciation reserve. The argument that the Secretary was without authority to prescribe the amount of this allowance is obviously ineffectual. In fixing reasonable rates for the stockyards service it was necessary for the Secretary to ascertain the outlays which that service would require and the amount which should reasonably be reserved out of income to cover depreciation in the property used. It was also necessary for the Secretary in estimating the latter allowance to examine the history of the property and the amounts which in the course of appellant's operations had been found necessary for repairs and replacements. On the facts disclosed by the extensive evidence, the Secretary concluded that $80,-000 was an adequate amount to be included in appellant's annual expenses "to cover repairs and provision for depreciation reserve." The Secretary had found that the amount expended for repairs on appellant's used and useful property for the preceding ten years had averaged about $38,500 a year. This finding does not appear to be contested, and from it appellant concludes that the Secretary has allowed the remainder of $80,000, or $41,-500, to be carried annually to the depreciation reserve account. Appellant insists that the yearly depreciation allowance should be not less than $100,000.

On December 31, 1932, appellant had accumulated a depreciation reserve of $1,771,063. This reserve had been accumulated since 1914. In an appraisal made by the American Appraisal Company in 1922, on the basis of reproduction new, the then existing depreciation was estimated at $621,171 and a reserve of that amount was then provided by a surplus adjustment. From that time until 1932 appellant set aside from $120,000 to $130,000 annually making a total provided for depreciation since 1914 of about $1,887,000. In that entire period, by the computation of the Government which does not seem to be

controverted, there had been charged against the depreciation reserve for retirements only about $116,405, of which about $103,500 were for retirements in the period 1922 to 1932, inclusive. The Government contends that the structural property in the pen areas, embracing pens, fences, runways and other yard structures, had been kept in proper operating condition principally by ordinary repairs and piecemeal replacements. The Government argues that the cost of reproduction new of this part of the property is approximately one-half of the reproduction cost of the entire property, and that from 1916 to 1932 the value of that portion of the property which was retired amounted to about $40,000. Appellant states that in 1926 to 1930, inclusive, the amount of pen structures which were retired was $41,639. On the other hand, it appears that the amount set up for depreciation on that class of assets was over $600,000.

Whatever may be said of this or that detail, it is quite clear that the amounts carried annually to the depreciation reserve were excessive. The Government's analysis tends to show that an average of approximately $47,000 annually would have been sufficient to take care of the repairs, maintenance and retirements during the period for which the financial history of appellant is available, and that the Secretary's allowance of $80,000 for both repairs and depreciation reserve is about $33,000 in excess of the amount shown to be actually required on the basis of that experience.

In the light of appellant's practice in accumulating an excessive reserve by its charges to operating expenses, a close examination was called for and a considerable deduction in the amount of such allowances in fixing reasonable rates was necessary. We have had occasion recently to discuss the general question of depreciation reserves at some length (*Lindheimer* v. *Illinois Telephone*

*Co.*, 292 U. S. 151) and we need not repeat what was there said. The question now presented is one of sound judgment upon the present record. We agree with the District Court that the Secretary endeavored to reach a fair conclusion and that the Government's analysis is persuasive. The argument that the Secretary employed the sinking fund method and upon that basis made an inadequate allowance does not find support in his findings. It is apparent that he sought to make an allowance which according to the nature of the property and appellant's experience would be adequate to cover repairs and replacements with a further provision to maintain a reasonable depreciation reserve. The evidence and appellant's contentions with respect to it do not satisfy us that the Secretary reached an unjustified result.

*Income.*—The Secretary allowed seven per cent. as the rate of return, and appellant presents no complaint as to that. *Wabash Valley Electric Co.* v. *Young,* 287 U. S. 488, 502; *Los Angeles Gas Corp.* v. *Railroad Commission, supra,* p. 319. Applying the rates he fixed, the Secretary estimated the annual gross income at $621,831, and operating expenses, including the contribution to depreciation reserve as above stated, at $426,267, leaving a net balance of $195,564, slightly over seven per cent. on the fair value of the property.

Appellant's revenue is derived from yardage charges, from the sale of feed and bedding, and from special services. The Secretary made no change in the charges for miscellaneous services, such as loading and unloading, dipping and spraying, cleaning and disinfecting, etc. The revenue from these services was estimated at $90,500. The profit on sales of feed and bedding was estimated at $82,800. The yardage revenues are derived from charges (1) for yarding livestock arriving fresh from the country, (2) for yarding livestock resold or reweighed for purpose

of sale, and (3) for the use of feed lot facilities. The reductions directed by the Secretary were in (1) and (2) and the revenue from the new rates for these services was estimated at $412,775. As to (3), for livestock held in the feed lots, the Secretary provided for an increase of charges, fixing maximum rates estimated to produce a revenue of $35,756.

It appears that formerly the feed lots were leased and on the first hearing before the Secretary their value was excluded from the rate base. After 1930 they were operated under appellant's supervision and appellant filed its rates for their use. Accordingly, on the second hearing, the Secretary found that the feed lots were used and useful and included them in the rate base. The principal "feeding business" is the feeding of sheep. The increase in rates, for which the Secretary provided, was from 15 cents and 35 cents per head for cattle (depending upon the use of sheds and other enclosures) to 60 cents, and from 5 cents per head for hogs and sheep to 38 cents. Despite the increase, appellant contends that the order as to feed lot charges is void; that there were no findings to support it and no true hearing; that the evidence did not sustain the Secretary's conclusions, and that although the order was based upon a finding of unjust discrimination, there was no alternative permitted in removing it.

It is manifest, however, that when the feed lots were brought into the rate base, it was appropriate that the reasonableness of the charges for their use should be considered. This was part of the subject before the Secretary. In the order for reopening the proceeding, the Secretary had stated that a general inquiry would be made "into the reasonableness and lawfulness of each and every rate and charge . . . stated in any and all schedules of rates and charges filed by respondent" (appellant here). The Secretary found that "under the existing schedule shippers of livestock who consign their animals to commission men"

were charged more for the use of appellant's facilities "in handling such livestock for a shorter period of time" than those who used the "feed lots for a much longer period of time." The Secretary found that the existing rates were "unreasonable and unjustly discriminatory." The feed lots were embraced in the tracts the value of which was estimated on a unit basis. The findings show appellant's operating expenses. We find no merit in the contentions that there was a lack of notice, or a lack of evidence as to the use of the feed lots or as to the discriminatory effect of the existing rates. We do not think that the decisions cited as to the affording of an alternative for the removal of discrimination are applicable to the present case. For the Secretary's action here was to provide for a reasonable charge for the use of the feed lots, so that those who did not use them should not bear an unreasonable burden. Whether appellant would be able to obtain the estimated revenue from the increased rates should be determined by a fair test of the permitted charges.

The reductions by the Secretary were in the charges for yardage services. The Secretary made different reductions for rail and truck shipments, and this differentiation is challenged. For example, under the existing rates, appellant's charge was 35 cents per head of cattle received by rail and 40 cents per head received by truck. The Secretary reduced the charge to 27 cents as to the former and to 35 cents as to the latter. There are differences in the two sorts of receipts in that in the one case there is a loading and unloading charge and, as detailed testimony showed, cattle received by rail consumed, as a rule, more feed than those received by truck. The evidence disclosed the services rendered in the case of cattle and other livestock, and the question is simply as to a fair determination in the light of all the circumstances. If the rates as prescribed were not confiscatory, the classification of rates was clearly within the Secretary's statutory authority.

There is a separate contention with respect to the rates or yarding livestock which was resold or reweighed for the purpose of sale. Appellant states that the Secretary's charges differed from its own in only one instance, that is, that the former are 1.5 cents per head lower on calves, but as the number of calves resold is negligible, that difference would not appreciably affect appellant's income. Appellant's tariff provided that on livestock resold in the commission division, there would be an additional charge of one-half the yardage charges. The Secretary found that despite this limitation, appellant in practice had imposed the charge on other resales, if they did not involve livestock "to go to the country," that is, bought by farmers to be fed. The Government's contention is that the practice lacked uniformity. The Secretary concluded that to impose the charge on resales in the commission division, but not on those in the traders division or elsewhere in the yard, was unreasonable and constituted an unjust discrimination. Appellant insists that the Secretary over-estimated the income from this source by $20,803. The controversy is over the number of livestock to which the charges for resales or reweighs for the purpose of sale would apply. The Secretary made a general estimate. He also found the number of head to which the charge would have been applicable in 1931 and 1932, and his estimate for the future was less than the average of those years. Appellant challenges the correctness of the computation and says that it rests upon an erroneous assumption that "order buyers" would pay a resale charge. The Government insists that the criticism is unjustified and points to evidence which is said to demonstrate conclusively that the Secretary's figures as to resales and reweighs are correct, and that appellant's argument is based on an application of the prescribed rates to "the wrong volume." It is unnecessary to recite the evidence. We think the Government substantiates its point.

The remaining question is with respect to the effect of the reduction of the other yardage charges, that is, for the yarding of livestock arriving fresh from the country; and, then, whether upon the whole case there would be such a deficiency in revenue as to establish confiscation. The revenue, of course, depends upon the quantity of livestock handled. The Secretary considered the fluctuation in receipts for a period of twenty-four years. The Government points to the statistical analysis as showing that cyclical fluctuations are characteristic of the business and that years of decline have been followed normally by an upward swing. The Secretary examined the actual receipts of each sort of livestock for the six years 1927 to 1932, inclusive. He did not attempt to make an exact prediction. Nor did he take an average of the six years. He took into consideration the lower volume of business in the later part of the period and made an estimate of the probable receipts which cannot be considered unfair. It was not an unsupported prophecy (compare *West Ohio Gas Co.* v. *Public Utilities Comm'n,* 294 U. S. 79, 82), but rather an endeavor to perform the essential duty of making "an honest and intelligent forecast" in view "of all the relevant circumstances." *Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 278. Applying the factors thus arrived at, the Secretary found that the prescribed rates would yield revenue sufficient to give the return above mentioned.

Appellant criticises the Secretary's estimates and insists that the prescribed rates would have been confiscatory during the entire period which the Secretary considered, making separate calculations for the period 1927 to 1931, and for 1932. The Government in turn points to necessary corrections in appellant's statements both of income and expenses and with those adjustments shows that under the prescribed rates appellant would have had an average yearly net return, for 1927 to 1931, of approxi-

mately $266,237, or about 9.7 per cent., and for the six-year period, 1927 to 1932, approximately $247,698, or about 9 per cent., on the fair value of its property as found. And while considering it to be improper to take the year 1932—the worst year of the depression period—as the basis for estimating return, the Government urges that, even in the abnormal conditions of that year, the prescribed rates would have produced a net return of 5.67 per cent.

Appellant seeks to buttress its case by reference to results of operations in later years. Its brief attempts to present the transactions of 1935. But there is no evidence properly before us save that contained in the record before the Secretary. Upon that record appellant stood in the District Court, and upon that record appellant must stand here. The hearing before the Secretary, held in 1933, necessarily proceeded upon an examination of the operations of the preceding years. The Secretary examined the course of business for a period sufficiently long to afford a basis for a reasonable estimate with due regard to the years preceding, and those during, the depression. His selection, and the use he made of it, is not open to any sound criticism. If the operations of later years show that the rates have become unreasonably low, appellant has its remedy. It has had, and still has, opportunity to apply to the Secretary of Agriculture for a modification of the prescribed charges. The only request for reopening the proceeding or for an adjustment of the rates, so far as now appears, was made early in 1934 prior to the order in question and before any adequate test of the rates.

We conclude that the appellant has failed to prove confiscation and the decree of the District Court is

*Affirmed.*

Mr. Justice Roberts concurs in the result.

Mr. Justice Brandeis, concurring.

I agree that the judgment of the District Court should be affirmed; but I do so on a different ground.

The question on which I differ was put thus by the District Court: "If in a judicial review of an order of the Secretary his findings supported by substantial evidence are conclusive upon the reviewing court in every case where a constitutional issue is not involved, why are they not conclusive when a constitutional issue is involved? Is there anything in the Constitution which expressly makes findings of fact by a jury of inexperienced laymen, if supported by substantial evidence, conclusive, that prohibits Congress making findings of fact by a highly trained and especially qualified administrative agency likewise conclusive, provided they are supported by substantial evidence?" 11 F. Supp. 322, 327.

Like the lower court, I think no good reason exists for making special exception of issues of fact bearing upon a constitutional right. The inexorable safeguard which the due process clause assures is not that a court may examine whether the findings as to value or income are correct, but that the trier of the facts shall be an impartial tribunal; that no finding shall be made except upon due notice and opportunity to be heard; that the procedure at the hearing shall be consistent with the essentials of a fair trial; and that it shall be conducted in such a way that there will be opportunity for a court to determine whether the applicable rules of law and procedure were observed.

Suits to restrain or annul an order of the Secretary of Agriculture are governed by the provision which Congress has made for reviewing orders of the Interstate Commerce Commission. *Tagg Bros. & Moorhead* v. *United States*, 280 U. S. 420, 432–433, 442–444. That provision does not, in my opinion, permit a district court

to set aside an order on the ground that the Secretary erred in making a finding of fact; and the jurisdiction of this Court to review its judgment is necessarily subject to the same limitation. As the District Court concluded that no applicable rule of law was disregarded by the Secretary; that for his findings there was ample support in the evidence; that taken together they support his conclusion that the rates are compensatory; and that the proceeding was in no respect irregular, it was in duty bound to dismiss the bill without enquiring into the correctness of his findings of subsidiary facts.

*First.* An order of the Secretary may, of course, be set aside for violation of the due process clause by prescribing rates which, on the facts found, are confiscatory. For the order of an administrative tribunal may be set aside for any error of law, substantive or procedural. *Interstate Commerce Comm'n* v. *Union Pacific R. Co.,* 222 U. S. 541, 547. Moreover, where what purports to be a finding upon a question of fact is so involved with and dependent upon questions of law as to be in substance and effect a decision of the latter, the Court will, in order to decide the legal question, examine the entire record, including the evidence if necessary, as it does in cases coming from the highest court of a State. Compare *Kansas City Southern Ry.* v. *Albers Commission Co.,* 223 U. S. 573, 591; *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 668–669. It may set aside an order for lack of findings necessary to support it, *Florida* v. *United States,* 282 U. S. 194, 212–215; or because findings were made without evidence to support them, *New England Divisions Case,* 261 U. S. 184, 203; *Chicago Junction Case,* 264 U. S. 258, 262–266; or because the evidence was such "that it was impossible for a fair-minded board to come to the result which was reached," *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 442; or because the

order was based on evidence not legally cognizable, *United States* v. *Abilene & Southern Ry.*, 265 U. S. 274, 286–290; or because facts and circumstances which ought to have been considered were excluded from consideration, *Interstate Commerce Comm'n* v. *Northern Pacific Ry.*, 216 U. S. 538, 544–545; *Northern Pacific Ry.* v. *Department of Public Works*, 268 U. S. 39, 44; or because facts and circumstances were considered which could not legally influence the conclusion, *Interstate Commerce Comm'n* v. *Diffenbaugh*, 222 U. S. 42, 46–47; *Florida East Coast Ry.* v. *United States*, 234 U. S. 167, 187; or because it applied a rule thought wrong for determining the value of the property, *St. Louis & O'Fallon Ry.* v. *United States*, 279 U. S. 461. These cases deal with errors of law or irregularities of procedure.

*Second.* The contention of the appellant is that the Secretary of Agriculture erred in making findings on which rest his conclusion that the rates prescribed are compensatory. The matters here in controversy are questions of fact—subsidiary issues, about 63 in number, bearing upon two main issues of fact: What is the "value" of the property used and useful in the business? What will be the income earned on that valuation if the prescribed rates are put into force?

By the Packers and Stockyards Act, the duty of investigating and determining the facts was committed by Congress to the Secretary. It was not disputed that ordinarily his findings made upon substantial evidence in properly conducted proceedings are conclusive. *Tagg Brothers & Moorhead* v. *United States*, 280 U. S. 420, 444. This Court has consistently declared in cases arising under the Interstate Commerce Act, that to "consider the weight of the evidence is beyond our province," *Western Paper Makers' Chemical Co.* v. *United States*, 271 U. S. 268, 271; *Chicago, R. I. & P. Ry.* v. *United*

*States,* 274 U. S. 29, 33–34; and that courts have no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions of fact, or with the alleged inconsistency of the findings with those made in other proceedings, *Virginian Ry. Co.* v. *United States,* 272 U. S. 658, 663, 665–666. Compare *New York & Queens Gas Co.* v. *McCall,* 245 U. S. 345, 348; *Georgia Ry. & Power Co.* v. *Railroad Commission,* 262 U. S. 625, 634; *Silberschein* v. *United States,* 266 U. S. 221, 225; *Ma-King Co.* v. *Blair,* 271 U. S. 479, 483.

The cases are numerous in which the attempt was made to induce this Court to annul an order of the Commission for error of fact; but in every case relief was denied. See *St. Louis & O'Fallon Ry.* v. *United States,* 279 U. S. 461, 493, n. 8. In this case also, the Court refuses to set aside the order. But it declares that an exception to the rule of finality must be made, because a constitutional issue is involved; and that the Court, weighing the evidence, must in its independent judgment determine the correctness of the findings of fact made by the Secretary. That view finds support in *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, and in general statements made in *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 488–490, and other cases; but it is inconsistent with a multitude of decisions in analogous cases hereafter discussed.

*Third.* The Fifth Amendment, like the Fourteenth, declares that property may not be taken without due process of law. But there is nothing in the text of the Constitution (including the Amendments) which tells the reader whether to constitute due process it is necessary that there be opportunity for a judicial review of the correctness of the findings of fact made by the Secretary of Agriculture concerning the value of this property or its net income. To learn what the procedure must be in a particular situation, in order to constitute due process, we

turn necessarily to the decisions of our Court. These tell us that due process does not require that a decision made by an appropriate tribunal shall be reviewable by another. *Pittsburgh, C., C. & St. L. Ry.* v. *Backus,* 154 U. S. 421, 426–427; *Reetz* v. *Michigan,* 188 U. S. 505, 508; *Dohany* v. *Rogers,* 281 U. S. 362, 369. They tell us that due process is not necessarily judicial process. *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 280; *McMillen* v. *Anderson,* 95 U. S. 37, 41; *United States* v. *Ju Toy,* 198 U. S. 253, 263. And they draw distinctions which give clear indication when due process requires judicial process and when it does not.

The first distinction is between issues of law and issues of fact. When dealing with constitutional rights (as distinguished from privileges accorded by the Government, *United States* v. *Babcock,* 250 U. S. 328, 331) there must be the opportunity of presenting in an appropriate proceeding, at some time, to some court, every question of law raised, whatever the nature of the right invoked or the status of him who claims it. The second distinction is between the right to liberty of person and other constitutional rights. Compare *Phillips* v. *Commissioner,* 283 U. S. 589, 596–597. A citizen who claims that his liberty is being infringed is entitled, upon habeas corpus, to the opportunity of a judicial determination of the facts. And, so highly is this liberty prized, that the opportunity must be accorded to any resident of the United States who claims to be a citizen. Compare *Ng Fung Ho* v. *White,* 259 U. S. 276, 282–285, with *United States* v. *Ju Toy,* 198 U. S. 253, and *Tang Tun* v. *Edsell,* 223 U. S. 673, 675. But a multitude of decisions tells us that when dealing with property a much more liberal rule applies. They show that due process of law does not always entitle an owner to have the correctness of findings of fact reviewed by a court; and that in deciding whether such review is required, "respect must be had to

the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these: and if found suitable or admissible in the special case, it will be adjudged to be 'due process of law.'" Mr. Justice Bradley, in *Davidson* v. *New Orleans,* 96 U. S. 97, 107.

Our decisions tell us specifically that the final ascertainment of the facts regarding value or income may be submitted by Congress, or state legislatures, to an administrative tribunal, even where the constitutionality of the taking depends upon the value of the property or the amount of the net income. Thus:

(a) No taking of property by eminent domain is constitutional unless just compensation is paid. But in condemnation proceedings the value of the property, and hence the amount payable therefor, need not be determined by a court. "By the Constitution of the United States, the estimate of the just compensation for property taken for the public use, under the right of eminent domain, is not required to be made by a jury; but may be entrusted by Congress to commissioners appointed by a court or by the executive, or to an inquest consisting of more or fewer men than an ordinary jury." *Bauman* v. *Ross,* 167 U. S. 548, 593. In *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685, 695, it was said that "there is no denial of due process in making findings of fact by the triers of fact, whether commissioners or a jury, final as to such facts, and leaving open to the courts simply the inquiry as to whether there was any erroneous basis adopted by the triers in their appraisal, or other errors in their proceedings." In *Crane* v. *Hahlo,* 258 U. S. 142, 148, the Court said in applying the same rule to a statute which allowed a judicial review of the facts only in case of "lack of jurisdiction, or fraud, or wilful misconduct on the part of the members of the Board": "This

afforded ample protection for the fundamental rights of the plaintiff in error, and the taking away of the right to have examined mere claims of honest error in the conduct of the proceeding by the Board did not invade any federal constitutional right." See also, *United States* v. *Jones*, 109 U. S. 513, 519; *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557, 569.

(b) No taking of property by taxation is constitutional unless the exaction is laid according to value, income or other measure prescribed by law. But Congress has, with the sanction of this Court, broadly given finality to the determination by the Board of Tax Appeals of the facts concerning income. By its legislation the jurisdiction of courts is limited to deciding "whether the correct rule of law was applied to the facts found; and whether there was substantial evidence before the Board to support the findings made." *Helvering* v. *Rankin*, 295 U. S. 123, 131; *Old Mission Portland Cement Co.* v. *Helvering*, 293 U. S. 289, 294. Compare *Cheatham* v. *United States*, 92 U. S. 85, 88–89. No court may pass upon the correctness in fact of any finding of the Board.

(c) The due process clause is not violated by giving in tariff acts finality to the valuations made by appraisers of imported merchandise belonging to American citizens. *Hilton* v. *Merritt*, 110 U. S. 97, 107. "It was certainly competent for Congress," said the Court in *Passavant* v. *United States*, 148 U. S. 214, 219, "to create this board of general appraisers, called 'legislative referees' in an early case in this court, (*Rankin* v. *Hoyt*, 4 How. 327, 335,) and not only invest them with authority to examine and decide upon the valuation of imported goods, when that question was properly submitted to them, but to declare that their decision 'shall be final and conclusive as to the *dutiable value* of such merchandise against all parties interested therein.'"

(d) The due process clause is not violated by legislation which requires a fire insurance policy to provide that the amount of the loss (and hence values) shall be determined by a board of appraisers; and that their decision, if not grossly excessive, or inadequate, or procured by fraud, shall be conclusive as to the amount of the loss. *Hardware Dealers Mutual Fire Insurance Co.* v. *Glidden Co.,* 284 U. S. 151.

(e) The due process clause is not violated by giving finality to assessments of value made for the purpose of *ad valorem* taxation, although in those proceedings the opportunity for a hearing is far less ample than under the statute here in question. Compare *State Railroad Tax Cases,* 92 U. S. 575, 610; *Kentucky Railroad Tax Cases,* 115 U. S. 321; *King* v. *Mullins,* 171 U. S. 404, 429–431.

As we said in *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 446: "We do not sit as a general appellate board of revision for all rates and taxes in the United States"; and in *Coulter* v. *Louisville & Nashville R. Co.,* 196 U. S. 599, 607: "Of course, no court would venture to intervene merely on the ground of a mistake of judgment on the part of the officer to whom the duty of assessment was entrusted by the law."

Answering the suggestion of possible error in the final action of a board in valuing and assessing railroad property, the Court said in *Kentucky Railroad Tax Cases,* 115 U. S. 321, 335: "Such possibilities are but the necessary imperfections of all human institutions, and do not admit of remedy; at least no revisory power to prevent or redress them enters into the judicial system, for, by the supposition, its administration is itself subject to the same imperfections." In *Crane* v. *Hahlo,* 258 U. S. 142, 148, the Court intimating that even judges may err in their determinations of fact, held that legislators might,

in proceeding for the taking of property, act on "the policy that the greater good is sometimes served by making certain classes of decisions final and ending litigation, even though in a particular case the individual is prevented by review from correcting some error which has injured him."

These cases show that in deciding when, and to what extent, finality may be given to an administrative finding of fact involving the taking of property, the Court has refused to be governed by a rigid rule. It has weighed the relative values of constitutional rights, the essentials of powers conferred, and the need of protecting both. It has noted the distinction between informal, summary administrative action based on *ex parte* casual inspection or unverified information, where no record is preserved of the evidence on which the official acted, and formal, deliberate quasi-judicial decisions of administrative tribunals based on findings of fact expressed in writing, and made after hearing evidence and argument under the sanctions and the safeguards attending judicial proceedings. It has considered the nature of the facts in issue, the character of the relevant evidence, the need in the business of government for prompt final decision. It has recognized that there is a limit to the capacity of judges; and that the magnitude of the task imposed upon them, if there be granted judicial review of the correctness of findings of such facts as value and income, may prevent prompt and faithful performance. It has borne in mind that even in judicial proceedings the finding of facts is left, by the Constitution, in large part to laymen. It has enquired into the character of the administrative tribunal provided and the incidents of its procedure. Compare *Humphrey's Executor* v. *United States,* 295 U. S. 602, 628. And where that prescribed for the particular class of takings appeared "appropriate to the case, and just to the parties to be

affected," and "adapted to the end to be attained," *Hagar v. Reclamation District,* 111 U. S. 701, 708, the Court has held it constitutional to make the findings of fact of the administrative tribunal conclusive. Thus, the Court has followed the rule of reason.

*Fourth.* Congress concluded that to give finality to the findings of the Secretary of Agriculture of the facts as to value and income is essential to the effective administration of the Packers and Stockyards Act. The *Ben Avon* case, and the statements in *Manufacturers Ry. Co. v. United States,* and casual references in other cases, should not lead us to graft upon the rule discussed, and so widely applied to other takings, a disabling exception applicable to rate cases. In none of the rate cases relied upon was there any reason given for denying to Congress that power; nor was there mention of the many decisions in which the power to prescribe finality was upheld. In none was there noted the distinction between challenging the correctness of findings of fact on which rest the conclusion as to confiscation, and challenging the conclusion of law as to confiscation on facts found. Here, some reasons have been offered in support of making the exception; but no reason given seems to me sound.

(a) It is urged that since Congress did not, and could not, delegate to the Secretary authority to prescribe a confiscatory rate, the facts in issue are jurisdictional and, hence, the Court must have power to review them. But, as was said in *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331, 336: "The challenge of a prescribed rate as being confiscatory raises a question not as to the scope of the Commission's authority but of the correctness of the exercise of its judgment." Therefore, *Crowell* v. *Benson,* 285 U. S. 22, has no application here.

(b) It is said that, since regulating rates is legislation, courts must have the same power to review facts which they possess in passing on the constitutionality of

statutes—otherwise the supremacy of law could be impaired by delegation to an administrative tribunal of a power to make final determinations that the legislature lacks. To that argument there are several answers. It fails to note that a rate order may be complained of as being confiscatory, not because of error in a finding of value or income, but because the regulating body has, in reaching its conclusions, ignored established principles or incontestable facts, or been guilty of dishonesty or of other irregularity in the proceeding. Whenever a legislative body regulates a subject within the scope of its power, a presumption of constitutionality prevails, in the absence of some factual foundation of record for overthrowing the regulation, *O'Gorman & Young* v. *Hartford Fire Insurance Co.*, 282 U. S. 251, 257–258; and this rule extends to such action by an administrative body. *Pacific States Box & Basket Co.* v. *White*, 296 U. S. 176, 185–186. If there be in the record conflicting evidence as to the facts assumed, a court may not substitute its independent judgment for that of the legislative body. Mere denial of facts relied upon as conditioning the validity of legislation does not confer upon a court authority to decide what is called the truth; that is, the absolute existence in reality of facts alleged. "Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question of what the facts establish be a fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker." *Radice* v. *New York*, 264 U. S. 292, 294. Here, the Court's duty is to determine merely whether there was evidence upon which reasonable men could have found as the Secretary did, with regard to value and income. Obviously the case at bar is not one in which "it was

impossible for a fair-minded board to come to the result which was reached." Compare *Van Dyke* v. *Geary*, 244 U. S. 39, 48–49.

Moreover, argument based on the analogy of the review of statutes fails to note the distinction between determinations of fact made in a quasi-judicial proceeding surrounded by all the safeguards which attend trials by a court, and assumptions, or conclusions, as to facts made by a legislature on information which lacks those safeguards. It fails to note also the subsidiary character of the issue involved in a finding of value or income; and that it is only as to these subsidiary issues that finality of the finding is asserted here.

The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied; and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality. But supremacy of law does not demand that the correctness of every finding of fact to which the rule of law is to be applied shall be subject to review by a court. If it did, the power of courts to set aside findings of fact by an administrative tribunal would be broader than their power to set aside a jury's verdict. The Constitution contains no such command.

*Fifth.* The history of this case illustrates that regulation cannot be effective unless the legality of the rates prescribed may, if contested, be determined with reasonable promptness. Six and one-half years have elapsed since the Secretary of Agriculture concluded that the rates of this utility were so high as to justify enquiry into their reasonableness, and nearly two years since entry of his order prescribing the reduced rates. In the judgment of the lower court and of this Court the attack upon the order

reducing them was unwarranted. But the rates of 1929 have remained in force; and, despite the supersedeas and injunction bonds, there will be practically no redress for the wrong done to the business community throughout the long years in which excessive rates have been exacted. Neither party is chargeable with lack of diligence in the investigation or litigation; and there is no suggestion of undue delay on the part of either court. The long delay is due to other causes.

The investigation of the Company's rates was ordered October 9, 1929. The hearing began December 2, 1929. All the subsidiary enquiries of fact commonly incident to applying the rule of *Smyth* v. *Ames,* 169 U. S. 466, were entered upon. After the hearing had closed, the Company sought to have it reopened for the admission of evidence showing how the changed conditions of business since 1929 would affect plaintiff's income and the net return on the property used. This application was refused by the Secretary; and he entered an order fixing maximum rates, which, on his valuation of the property and estimate of earnings, would have yielded a return of 7½ per cent. if in effect in 1928. Thereupon, the Company filed a bill in the District Court to set aside the order on the ground that it would deprive petitioner of its property in violation of the due process clause. That court heard additional evidence, as well as receiving the record of the proceedings before the Secretary. It considered, but did not pass on, the merits. For it set aside the order on the ground that the Secretary should have acceded to the request to reopen the hearings. *St. Joseph Stock Yards Co.* v. *United States,* 58 F. (2d) 290. The new hearing was begun January 10, 1933 and did not close until February 16, 1933. Thereafter, the Secretary entered the order here under review; and the second suit followed which is here on appeal.

*Sixth.* The abstract of record made before the Secretary and submitted to the District Court for review consisted of 1648 printed pages of evidence, besides 111 exhibits, many being extensive. Twenty-two witnesses testified orally. The 71 exhibits certified to this Court alone comprise 1358 pages of tabulations or like detail. In addition they contain 18 graphs, 30 maps or photographs, and 600 pages of reading matter. Consideration of most of the evidence presented to the Secretary was deemed essential to a proper determination by the District Court of the issues of fact now controverted. Consideration of most of the evidence introduced below is now deemed by counsel necessary for a proper decision of the case by this Court. The condensed narrative statement of the evidence other than exhibits fills 721 pages of the printed record in this Court. Seventy-one exhibits (although not required to be printed) were required to be transmitted to this Court as a part of the record before us. The number of pages of the evidence (including exhibits) before us bearing more or less specifically upon the question of confiscation is 2717. The total number of pages—briefs, exhibits, and evidence—before this Court is 3466.

The magnitude of the task involved in a judicial review which requires a determination by the Court, in its independent judgment, of the correctness of the findings of fact as to value and income which the Secretary made, cannot be measured by looking alone at the volume of the evidence. The multiplicity of the issues, and the character of the evidence bearing on them respectively, impose a peculiar burden. The findings as numbered and lettered by the Secretary total 215. The number of determinations of fact bearing upon confiscation involved in these findings is, roughly, 250, as gathered from the 108-page opinion of the Secretary. To decide whether any one of these 250 determinations of fact alleged to be errone-

ous is, or is not, correct, involves separate examination of the evidence relating specifically to it; since as to each of these determinations the reviewing court is called upon to make a decision, in the exercise of an independent judgment. Such a decision involves, in many cases, weighing specific evidence and resolving conflicts.

(a) There is controversy as to the extent to which property owned by the Company is used or useful. That enquiry relates to 52 different items. The testimony and exhibits bearing upon this issue occupy 194 pages. On it there are approximately 50 findings. The correctness of only one of these is controverted here.

(b) There is controversy as to the value of the land. It consists of 60 different tracts. The testimony and exhibits bearing upon their value occupy 596 pages (the exhibits number 20). On this issue there are about 10 findings. The correctness of 3 is controverted here, dealing with the land in a single "zone."

(c) There is controversy as to the value of the structures. It deals with reproduction costs; it requires separate consideration of materials and labor, of overheads and depreciation. The testimony and exhibits occupy 629 pages (the exhibits number 12). On these issues there are some 40 findings. Those dealing with depreciation are controverted here.

(d) There is controversy as to going concern value. The testimony and exhibits on this issue occupy 113 pages. The Secretary decided that no separate allowance should be made. That conclusion is controverted here.

(e) There are controversies as to the estimated income, as to the expenses, and as to charges. The testimony and exhibits bearing upon them occupy, in the aggregate, 663 pages (the exhibits number 42). On these issues there are approximately 140 determinations. Of these about 50 seem to be controverted here.

The decisions by the reviewing court on the correctness of many of these determinations must depend upon its judgment as to the credibility of the witnesses. For instance, the Company insists, as to the land in one zone, that it is worth, on the average, 25 cents per square foot. The Secretary found it was worth 16 cents.. On that issue 5 witnesses testified.

This case, like a laboratory experiment, presents the task of rate-regulation in its simplest form. The rates to be regulated are but few in number. The rate base is ordinary stockyard property small in extent as compared with some plants. The Secretary valued it at $2,743,000; and the Company claims it is worth $1,010,-406 more. The Secretary found that, at the prescribed rates, the receipts would yield a net income of $195,564; the Company claims that it would not have been more than $81,026 in 1932 had these rates been in effect. But, under the prevailing view, an enquiry of the scope described was necessary, although involving hearings and lawsuits so protracted as to frustrate rate-regulation.

*Seventh.* The greater delay, and the cost, in rate investigations affecting the larger utilities, is illustrated by cases which have come before this Court in recent years.

(a) *Chicago Telephone Rates.* On September 13, 1921, the Illinois Commerce Commission, the regulating body, issued an order that the Company show cause why its rates should not be reduced. The hearing began November 17, 1921, and closed July 31, 1923. On August 16, 1923, the Commission entered an order reducing the rates, to become effective October 1, 1923. Before that date, enforcement was enjoined by the federal court, on a bill which charged that the rates prescribed were confiscatory. On April 30, 1934, this Court sustained the validity of the rate order entered August 16, 1923. Thus the rates became effective twelve and a half years after the com-

mencement of the investigation; and nearly eleven years after they were prescribed.

On June 11, 1934, the District Court ordered the Company to reimburse consumers who had been charged excessive rates a sum estimated, in April, 1936, as almost $19,000,000; and, on July 23, 1934, directed that the lawyers who appeared for the consumers in and after 1929 should receive as fees an amount equal to 7½ per cent of the refunds. By March 31, 1936, 1,153,515 payments had been made. The task of making the refunds, only three-quarters complete, has required a special force of 2,000 of the Company's employees, and is said to have cost it (to November 30, 1935) $2,575,412.89. Over $2,100,000 remains to be disposed of or paid.

The transcript of evidence and arguments at the hearing before the Illinois Commission fills about 4500 pages; and there were besides more than 200 elaborate exhibits. The presentation of the evidence before the District Court at the first hearing on the merits occupied more than two months, resulting in a printed record of over 3000 pages of testimony and 281 elaborate exhibits. The taking of depositions for presentation to that court on the second hearing on the merits, and other preparations for trial, took over a year. The hearing itself occupied five months, and resulted in a record of 16,168 pages. The record on the first appeal to this Court consisted of seven large volumes. The record of the additional evidence on the second appeal to this Court filled nine volumes; and the appellant's brief here, with appendix, nearly 700 pages.

The investigation of rates for Chicago continues. On July 10, 1934, the Commission asked the Company to show cause why its rates should not be reduced. The latter spent over a year and a half preparing its case for presentation to the Commission, at a cost, including a new appraisal and inventory, of more than $1,200,000. Hearings are now in progress.

For the history of the investigation and litigation, see in this Court: 269 U. S. 531; 282 U. S. 133; 283 U. S. 794; 283 U. S. 808; 292 U. S. 151; in the lower court: 39 F. (2d) 157; 38 F. (2d) 77; 3 F. Supp. 595; in the Commission: 7 Opinions and Orders of Ill. P. U. Comm. 1920, 888; 8 *id.* 1921, 372; 3 Opinions and Orders of Ill. Commerce Comm. 1924, 75–99; 6th Administrative Report of Directors of Departments, Ill. Commerce Comm. 1923, 975; 7th *id.* 1924, 1166; 17th Annual Report Ill. Commerce Comm. 1934, 3, 18, 42; 18th Annual Report Ill. Commerce Comm. 1935, 20. See also N.-Y. Times, May 1, 1934, at 10; June 12, at 10; October 15, at 27; Report to Stockholders of Ill. Bell Telephone Co. 1935, 7, 8, 15.

(*b*) *New York telephone rates.* In the winter of 1919 the Company increased its rates. Protests followed; and on October 18, 1920, hearings thereon began before the Public Service Commission. On March 3, 1922, a temporary order slightly reducing certain rates issued. Enforcement was enjoined by the federal court on a bill which charged that the rates prescribed were confiscatory. Since that time, the rates prescribed, and to be prescribed, have been continuously under investigation and litigation.

Before the Commission there were, between 1920 and 1926, 189 days of hearings, 450 witnesses being examined orally. The evidence introduced fills, in the aggregate, 26,417 pages; and there were, in addition, 1,043 elaborate exhibits, one alone being in 22 volumes. Hearings were also held from January 28, 1930, to April 18, 1930. The opinions of the Commission in these proceedings fill 396 pages. In the District Court the hearings before the master occupied 416 days and extended over a period of four years, 610 witnesses being examined orally. They were recalled a total of 688 times. The evidence of that hearing fills 36,893 pages; and there were in addition 3,324 exhibits. The decree below was entered November

7, 1929. The Company's counsel then labored two years in preparing a draft of the condensed narrative statement of the evidence required for the transcript of record on the appeal to this Court. On submitting this draft to counsel for the Commission, the City, and the State, many errors were discovered. On 3000 of the items, counsel disagreed; months were devoted to composing the differences; and finally the items on which counsel could not agree were settled by the lower court. On November 14, 1933, more than four years after entry of the decree appealed from, the Company filed here a record of 5700 pages. On February 19, 1934, that appeal was dismissed.

On May 2, 1934, the Commission instituted a new investigation into the rates of the Company. Hearings began May 10, 1934, and are still going on. The subjects covered are again those required by the rule of *Smyth* v. *Ames*—reproduction cost, going value, depreciation, and so forth. Up to April 14, 1936, 86 hearings had been had, stretching through every month but one since the beginning of the enquiry. One hundred and forty witnesses had been heard, and 10,840 pages of testimony taken. The exhibits already introduced total 397, one being in 34 volumes.

For the history of the investigation and litigation, see in this Court: 261 U. S. 312; 262 U. S. 43; 291 U. S. 645; in the lower court: S. D. N. Y. No. 23–252, in equity, May 25, 1922 (not reported); 300 Fed. 822; 11 F. (2d) 162; 36 F. (2d) 54; in the Commission: 14th Annual Report, Pub. Ser. Comm. (2d Dist.) 1920, 79; Report Pub. Ser. Comm. 1921, 13, 234–254, 369–389, 398–407, 447–458; 1922, 15; 1923, 13, 93–214; 1924, 13, 127–138; 1925, 13; 1926, 17, 170–273; 1927, 14; 1928, 18; 1929, 16; 1930, 42, 134–145, 213–294; 1933, 11. See also Report of Pub. Ser. Comm. to State Senate Relative to Rates of N. Y. Telephone Co., Legis. Doc. No. 73, 1926 (254 pages); Report of Commission on Revision of N. Y. Pub. Ser. Comm. Law, Legis.

Doc. No. 75, 1930, 28–31, 262–268; "Your Company and the Rate Decision," a bulletin issued for the use of its employees by the N. Y. Telephone Co., 1930; Nathaniel Gold, "One More Telephone Decision," 15 Nat. Mun. Rev. 419; "The New York Telephone Rate Decision," 19 *id.* 180; "An Example of Rate Litigation and Its Significance," 23 *id.* 584; John Bauer, "An Example of Futility in Present Methods of Public Utility Regulation," 15 Am. Econ. Rev. 586; Leland Olds, "The Public Utility Issue," 24 Yale Review (N. s.) 704, 706–707; New York Times, May 2, 1934, at 1; May 11, at 1; May 17, at 25; September 21, at 25; February 27, 1935, at 20; March 30, at 7.

*Eighth.* In deciding whether the Constitution prevents Congress from giving finality to findings as to value or income where confiscation is alleged the Court must consider the effect of our decisions not only upon the function of rate regulation, but also upon the administrative and judicial tribunals themselves. Responsibility is the great developer of men. May it not tend to emasculate or demoralize the rate-making body if ultimate responsibility is transferred to others? To the capacity of men there is a limit. May it not impair the quality of the work of the courts if this heavy task of reviewing questions of fact is assumed?

The obstacles encountered in the case at bar and in the regulation of the rates of the large utilities are attributable, in the main, to the Court's adherence to the rule declared in *Smyth* v. *Ames* for determining the value of the property. In *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 289, I stated my reasons for believing that the Constitution did not require the Court to adopt that rule which so seriously impairs the power of rate-regulation. But since the decision of *Smyth* v. *Ames* is adhered to, there is the greater need of applying to cases in which rate-regulation is alleged to be confiscatory the rule of reason

under which the Court has sanctioned, in other cases of taking, the legislative provision giving finality to quasi-judicial findings of value and income by administrative tribunals.

Surely, all must agree with the Secretary of Agriculture that: "If rate regulation is to be effective, there must come at some time an end of hearings and a decision of the questions involved." In *Chicago, Burlington & Quincy Ry.* v. *Babcock,* 204 U. S. 585, 598, we said of valuations made by the State Board of Equalization and Assessment: "Within its jurisdiction, except as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end." Congress concluded that a wealthy and litigious utility might practically nullify rate regulation if the correctness of findings by the regulating body of the facts as to value and income were made subject to judicial review. For that conclusion experience affords ample basis. I cannot believe that the Constitution, which confers upon Congress the power of rate-regulation, denies to it power to adopt measures indispensable to its effective exercise.

MR. JUSTICE STONE and MR. JUSTICE CARDOZO concurring in the result:

We think the opinion of Mr. Justice Brandeis states the law as it ought to be, though we appreciate the weight of precedent that has now accumulated against it. If the opinion of the Court did no more than accept those precedents and follow them, we might be moved to acquiescence. More, however, has been attempted. The opinion reëxamines the foundations of the rule that it declares, and finds them to be firm and true. We will not go so far.

The doctrine of *stare decisis,* however appropriate and even necessary at times, has only a limited application in the field of constitutional law. See the cases collected by Brandeis, J., dissenting, in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 407, 408. If the challenged doctrine is to be reconsidered, we are unwilling to approve it.

For the reasons stated by MR. JUSTICE BRANDEIS the decree should be affirmed.