**R. C. A. COMMUNICATIONS, Inc., v. UNIT-
ED STATES et al. (INTERNATIONAL
COMMUNICATIONS COMMITTEE, Inter-
vener).**

District Court, S. D. New York.

Feb. 4, 1942.

852

Manton Davis, Frank W. Wozencraft, and John F. Gibbons, all of New York City (George F. Hurd, Lawrence Hunt, Vincent W. Farley, and Edward E. Weadock, all of New York City, of counsel), for plaintiff.

Thurman Arnold, Asst. Atty. Gen., Samuel S. Isseks and James C. Wilson, Sp. Assts. to the Atty. Gen., for defendant, United States of America.

Telford Taylor, Gen. Counsel, and Thomas E. Harris, Asst. Gen. Counsel, both of Washington, D. C., Donald M. Harris, of New York City, and Harold J. Cohen, Daryal A. Myse, Omar L. Crook, and David C. Adams, all of Washington, D. C., for defendant Federal Communications Commission.

Townley, Updike & Carter, of New York City (Louis G. Caldwell, Donald C. Beelar, and Edward K. Wheeler, all of Washington, D. C., of counsel), for intervener International Communications Committee.

Before AUGUSTUS N. HAND, Circuit Judge, and KNOX and CONGER, District Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a suit brought by R. C. A. Communications, Inc., under the provisions of the Urgent Deficiencies Act as extended by Section 402(a) of the Communications Act of 1934, as amended, 47 U.S.C.A. § 402(a), to enjoin and set aside, as respects the plaintiff, an order of the Federal Communications Commission issued under date of May 27, 1941.

The plaintiff is a common carrier engaged in communication by radiotelegraph between the United States and foreign countries. Its service includes various classes of messages for which different

ratios of charges are made. Among such classes are Urgent, plain language, and Urgent, code messages, the charges for which have been established by international agreements at double the charges for Ordinary plain language and Ordinary code messages. Urgent messages have priority over all other private telegrams. The great majority of Urgent messages handled by the plaintiff are transmitted from or received through its radio stations located in the State of New York, near New York City. It is the reasonableness of the ratio between the charges for Urgent and Ordinary messages which was an issue in the proceeding before the Communications Commission in which the order of May 27, 1941, was made.

Telegrams originating in the United States and destined to foreign points are transmitted by the plaintiff through radio transmitting stations owned and operated by it in the United States and are received abroad through radio receiving stations operated in almost every instance either by the governments of the countries in which the stations are located or by carriers which are nationals of those countries. The tolls (charges from point of origin to point of destination) for such messages are collected at the point of origin in the United States and the portions of the tolls belonging to the various foreign administrations and companies involved in the complete service are remitted to them by plaintiff.

Telegrams originating abroad and destined to points in the United States, or traversing the United States to other foreign destinations, are transmitted through radio transmitting stations owned and operated by foreign governments or foreign carriers, and are received through radio receiving stations owned and operated by the plaintiff in the United States. The tolls for such telegrams are collected at the foreign point of origin from the senders in foreign countries and the portions of the tolls accruing to plaintiff are remitted to it by its foreign correspondents with which it maintains public radiotelegraph service.

The tolls collected by plaintiff for messages which originate in the United States and are destined to foreign points are set forth in tariffs filed with the Federal Communications Commission, and are determined by contracts between the plaintiff and its foreign correspondents. The Commission also has required the plaintiff to

file with it tariffs showing the inbound rates for messages originating abroad and destined to points in the United States.

Messages originating in the United States and destined to points with which plaintiff does not have direct circuits are transmitted by plaintiff to one of its foreign correspondents and transmitted onward by such correspondents to their destinations over the telegraph systems of other governments. Similarly messages destined to the United States which originate at points in foreign countries with which plaintiff does not have direct radiotelegraph circuits are transmitted from the point of origin, over the telegraph systems of other governments, to one of plaintiff's foreign correspondents and then are transmitted onward by such foreign correspondent directly to plaintiff.

Each of plaintiff's radiotelegraph circuits between the United States and a foreign country is operated pursuant to a contract between plaintiff and the foreign government administration or carrier which operates the foreign end of the circuit. Copies of these contracts are filed with the Commission. Each of these contracts provides that the rates to be charged for messages handled over such circuits shall be fixed by agreement between the parties to the contract, and the tolls collected are shared upon an agreed basis. When either party wishes to make a change in any rate to be charged for messages handled over the jointly operated radiotelegraph circuit, it is necessary to secure the consent of the company or administration which operates the other end of the jointly operated circuit, subject to the regulations of its government.

The order of May 27, 1941, sought to be set aside so far as it is pertinent to the present issues, provides:

"* * * that on and after the 1st day of July, 1941, the lawful charge for handling Urgent Full Rate and Urgent CDE messages (except Press Urgent messages) shall not exceed 1½ times the charge for handling Ordinary Full Rate and Ordinary CDE messages, respectively, for messages between the United States, its territories and possessions, and any point with which the transmitting or receiving carrier within the United States, its territories or possessions, maintains direct communication, including messages which may originate at or be destined to a point beyond that with which direct communication is main-

tained for such portion of the handling as occurs between the United States, its territories and possessions and the point with which direct communication is maintained.

"* * * that on and after the 1st day of July, 1941, The Western Union Telegraph Company, R. C. A. Communications, Inc., and the Commercial Cable Company shall cease and desist charging, collecting and receiving, or participating in charges for Urgent Full Rate and Urgent CDE messages (except Press Urgent messages) as set forth hereinabove which bear any greater ratio than 1½ to 1 to the charges for Ordinary Full Rate and Ordinary CDE messages, respectively.

"* * * that the rates to be filed pursuant to this order may become effective upon less than thirty days notice to this Commission and to the public and that appropriate tariffs shall be filed."

We are of the opinion that the foregoing order is valid and that the bill of complaint should be dismissed, the preliminary injunction heretofore granted dissolved and the reserve established herein distributed by an appropriate order.

■ The order is first attacked on the ground that the Commission is without jurisdiction in attempting to fix maximum rates for an entire service when a portion of the service is rendered outside the United States by foreign sovereigns or foreign nationals. Jurisdiction is said to be lacking whether the messages originate or terminate within the United States, or whether they both originate and terminate without the United States and are retransmitted within the United States.

Section 1 of the Communications Act creating the Commission, and Sections 2(a) and 3(f), 47 U.S.C.A. §§ 151, 152(a), 153(f), provide as follows:

"Section 1 [§ 151]. For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is hereby created a commission to be known as the 'Federal Communications Commission', which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this Act [chapter].

"Section 2 [§ 152]. (a) The provisions of this Act [chapter] shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Philippine Islands or the Canal Zone, or to wire or radio communication or transmission wholly within the Philippine Islands or the Canal Zone.

*    *    *    *    *    *

"Section 3 [§ 153]. For the purposes of this Act [chapter], unless the context otherwise requires—

*    *    *    *    *    *

"(f) 'Foreign communication' or 'foreign transmission' means communication or transmission from or to any place in the United States to or from a foreign country, or between a station in the United States and a mobile station located outside the United States."

We think that the Commission's order falls directly within the terms of the statute. The plaintiff's contention that the order is directed against foreign countries or their nationals is unfounded. While it indirectly affects them inasmuch as they share in a joint rate, it operates directly only on persons within the United States and an indirect effect on outsiders does not militate against its validity. That is quite settled by News Syndicate Co. v. New York Central R. R., 275 U.S. 179, 48 S.Ct. 39, 72 L.Ed. 225; Lewis-Simas-Jones Co. v. Southern Pac. Co., 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333; Armour Packing Co. v. United States, 209 U.S. 56, 77-79, 28 S.Ct. 428, 52 L.Ed. 681. Cf. United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042.

The definition of "foreign communication" was restricted in the form of the bill which the Senate originally passed by the limiting provision: "in so far as such communication or transmission takes place within the United States." But the limitation was deleted in the final form, although the plaintiff, through its president, had argued before the House Committee on Interstate and Foreign Commerce in support of the limitation.

■■ A double rate for "Urgent" messages was first adopted at the International Telecommunication Conference held at Madrid in 1932 and was retained at the International Telecommunication Conference held at Cairo in 1938. Neither the United States, the plaintiff, nor any of the other carriers subject to the terms of the order of the Commission were parties to the Telegraph Regulations of Madrid or Cairo which most foreign nations agreed upon and which provided a 2 to 1 ratio for "Urgent" foreign messages. While the Commission's order of May 27, 1941, would have the effect of impairing the obligations of the plaintiff and other telegraph companies in respect to foreign radiotelegraphic rates established under their prior agreements with foreign governments or nationals, Congress had the power to regulate communication between the United States and foreign points, and to regulate the carriers engaged within the United States in such communication, regardless of whether the effects of the regulation might extend beyond our territory. All contracts which the carriers might make were subject to the power of Congress to regulate foreign commerce. Midland Realty Co. v. Kansas City Power & Light Co., 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540. The order of the Commission affected contracts which were not treaties between the United States and foreign governments, but essentially private agreements between radiotelegraph companies of the United States and foreign countries or nationals.

It is true that a reduction of the ratio for "Urgent" messages from double to not more than one and one-half times the ordinary rate will make it necessary for the plaintiff, if it cannot secure an amendment of the existing agreements, either to break its contracts for foreign messages or to bear the loss on outgoing messages itself. The order forbids the plaintiff from participating in messages at the 2 to 1 ratio, originating abroad and terminating in or passing through the United States. To carry out the reduced ratio is impracticable, if not impossible, without making new agreements with the foreign governments or nationals. It has not been shown that new agreements cannot be obtained from these foreign governments or nationals who, in order to share in the proceeds of Urgent rates, might well prefer to make concessions. Moreover, the plaintiff has stood on its privilege and refused inspection of the existing agreements. These, for all we know, may have been made subject to governmental regulation. If they were not so made and the plaintiff's only alternative to observing the new ratio of 1½ to 1 is to abandon Urgent messages, the remedy would seem to lie in Congress or in the treaty-making power. If the 2 to 1 ratio for Urgent messages is too high, it surely is unreasonable for the public to be compelled to pay for them at that rate merely because the carriers have so agreed among themselves.

■ The contention of the plaintiff that the order interferes with the President's prerogative to negotiate treaties is without merit. There is no showing of an attempt or desire on his part to arrange rates for foreign urgent messages and Congress has set up a Commission with power to deal with such matters under an act having executive approval.

■ The order of May 27, 1941, is further attacked by the plaintiff on the ground that the Commission failed to make findings that the ratio of 2 to 1 was or would be unjust and unreasonable and that such findings are required by the Communications Act as a condition precedent to prescribing a ratio of 1½ to 1 in order to displace the ratio of 2 to 1 established by plaintiff prior to the organization of the Commission.

We think that Section 201(b) of the Act[1] gave the Commission sole authority

---

[1] "§ 201. * * * (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful: Provided, That communications by wire or radio subject to this Act [chapter] may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such oth-

to classify communications by wire or radio as "Urgent" and to fix reasonable charges therefor. Prior to the Madrid Conference, the International Telegraph Regulations provided that the rate for messages of the Urgent classification should be triple the rate for ordinary messages and Urgent messages were dealt with on that basis. After the Madrid Conference where the double ratio was agreed upon, and prior to the establishment of the Communications Commission, the plaintiff reduced its ratio for Urgent messages from triple to double the rate for ordinary messages and offered service accordingly. After the Commission was organized pursuant to the Communications Act of 1934 the plaintiff filed tariffs with the Commission in which it published the double rate for Urgent messages between the United States and foreign countries. It contends that this classification and ratio are prima facie lawful and could not be set aside by the Commission without a determination, after a hearing, pursuant to Sec. 205(a), 47 U.S.C.A. § 205(a), that it is of the "opinion" that the "charge, classification, regulation, or practice * * * is or will be in violation of the provisions" of the Act. But Section 201(b) empowered the Commission to establish a classification other than the "day, night, repeated, unrepeated, letter, commercial, press, Government" services specifically mentioned in the section, which it "may decide to be just and reasonable". It moreover provided that "all charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is * * * declared to be unlawful."

In the case at bar the Commission fixed the charges by requiring a ratio of 1½ to 1 as compared with ordinary messages for "Urgent" messages. The classification and charges which under Section 201(b) it alone was empowered to establish were such as it might "decide to be just and reasonable"; in other words under the wording of the section, the classi-

fication and ratio were not to be determined by what was in an objective sense "just and reasonable", but by what the Commission should decide to be such. In the circumstances, we find no justification for holding that Section 205(a) applies. That section appears to relate to cases where the classification or rate has been already fixed by the Commission and is being attacked. In such a situation a classification or charge already established must be overthrown by the person seeking relief, who is obliged to satisfy the tribunal that the classification or rate is unreasonable.

If Section 201(b) applies, the plaintiff cannot prevail because it has not established that a 2 to 1 rate is reasonable and its complaint would therefore have to be dismissed. But, though Section 205(a) should apply, nevertheless, the Commission has found upon substantial evidence that the rate of 2 to 1 is unreasonable and that the ratio of 1½ to 1 is reasonable. This especially appears from the portion of the decision of the Commission under the heading "Unreasonableness of Ratio" at page 84 of the complaint. The Commission there found that "the additional cost involved in supplying urgent service does not appear to justify the 2 to 1 ratio for the future", that "the maintenance of the 2 to 1 ratio (is not) justified by the application of the 'value of service' theory * * *", that "there is nothing in the record to indicate that a reasonable reduction in the basis for urgent charges would result in so increasing the traffic and thereby degrading the several services as to degrade the value of those services for the persons who really have need of them", that "on the contrary, the record does show that the maintenance of the existing 2 to 1 ratio has prevented the use of urgent service by certain persons who have a real need for the service", that "for the future the basis for urgent charges should be reduced". The decision concludes by saying:

"The cost studies in this proceeding do not afford a basis for a mathematical determination of an appropriate ratio of

er classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communication: Provided further, That nothing in this Act [chapter] or in any other provision of law shall be construed to prevent a common carrier subject to this Act [chapter] from enter-

ing into or operating under any contract with any common carrier not subject to this Act [chapter], for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest." 47 U.S.C.A. § 201(b).

charges for urgent messages as compared to ordinary messages. However, giving due consideration to the cost studies and to the other evidence in the record, the Commission concludes that the ratio should be reduced from 2 to 1 to 1½ to 1. Certain of the carriers in this proceeding maintained, prior to 1934, a classification of service known as 'preferred'. It is indicated that the 'preferred' service was somewhat comparable to that now classified as 'urgent'. The 'preferred' service was charged for on a basis, voluntarily fixed by the carriers of 1¼ times the rate for ordinary service. There is no indication that the 1¼ to 1 ratio was inadequate or that it resulted in so degrading the 'preferred' service as to destroy its value to users requiring extreme expedition. The tariff on the respondent Western Union Telegraph Company (Supplement No. 17 to F.T.C. Tariff No. 60) filed with the Commission on November 12, 1937, pursuant to the Commission's Report and Order heretofore referred to, fixed the ratio for urgent messages at 1½ to 1 over its own lines, which is indicative of the fact that that carrier was of the opinion that this ratio was proper. Counsel for the users stated in oral argument that a ratio of 1½ to 1 would be proper from the standpoint of the users."

■ The order is also attacked on the ground that it lacks substantial supporting evidence.

The Commission, on October 31, 1934, ordered a hearing for the purpose of inquiring, among other things, into the justness and reasonableness of the classes of telegraph communications not specifically authorized by § 201(b) of the Act and the justness and reasonableness of the ratio between the charges for each class of telegraph communications and the basic charge for full rate telegraph communications. Among the carriers engaged in the international field and participating in the hearing were Western Union, R.C.A. Communications, Inc., and the Commercial Cable Company, as well as a predecessor of the intervener, International Communications Committee. After holding extensive hearings, the Commission issued a report on June 14, 1937, with respect to Western Union, in which it concluded that an artificial delay of five minutes imposed by the latter on ordinary messages was unreasonable and that the ratio of 2 to 1 maintained between its charges for

urgent and ordinary service resulted in an unjust and unreasonable discrimination, and subjected the users of the urgent service classification to an unreasonable disadvantage. It added that since the facts and evidence might vary among the respective carriers, separate decisions and orders applicable to each of them might subsequently issue. After an order had issued based on the foregoing report of June 14, 1937, directing Western Union to cease from charging rates for urgent messages found in the report to be unjust and unreasonable and to establish and maintain rates for urgent messages which should bear a reasonable ratio to those for ordinary messages, Western Union filed a new schedule reducing its participation in charges for urgent cablegrams from the United States to England, France, Belgium and Holland from double to 1½ times the rate for ordinary cablegrams and abandoning the urgent classification with respect to all other countries. It thereafter moved for a reopening of the hearing and for a suspension of that portion of the order which forbade applying to urgent messages the ratio found in the report to be unreasonable. The plaintiff and Commercial Cable Company made similar motions. The cease and desist portions of the order of June 14 were thereupon suspended.

After taking a large amount of further testimony, the Commission rendered its decision on April 9, 1941, and in its "cease and desist" order of May 27, 1941, denied the plaintiff's petition for a rehearing. From the order of May 27, 1941, Western Union and the Commercial Cable Company have not appealed but, like various other companies engaged in foreign communication, seem to have acquiesced in the ratio prescribed by the Commission. This acquiescence, and the filing in November, 1937, by Western Union of a ratio of 1½ to 1 for urgent messages are indications that the ratio prescribed is a fair one. If it had believed the ratio of 1½ to 1 too low, it would naturally, when ordered to establish a ratio that was reasonable, have submitted a higher one, such as 1¾ to 1.

It seems reasonably clear that a lower ratio than 2 to 1 for urgent messages would have sufficiently compensated the carriers. There is evidence that prior to January 1, 1934, when the 2 to 1 ratio was established, a ratio of 1¼ to 1 was

applied to a socalled "preferred" service which closely resembled the urgent service we are dealing with here. The maintenance of this 1¼ to 1 ratio justified an inference that it was remunerative and required the carrier to explain the necessity for an increase. Interstate Commerce Comm. v. Union Pac. R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308; St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 53, 83, 56 S.Ct. 720, 80 L.Ed. 1033. Moreover, at the original hearing, Willever, vice-president of Western Union, when referring to negotiations in 1934 in respect to a rate for urgent messages, testified that there was at that time a proposal by the carriers of a 1½ to 1 rate if a drag of from 10 to 20 minutes should be allowed for ordinary messages. Likewise, Pennypacker, testifying on behalf of the intervener committee, said that in 1934 a proposal was made by the companies to reduce the urgent rate to 50% over the ordinary rate on the condition that a 10-minute drag would be allowed. The opinion of the companies, therefore, seems to have been that even a 1¼ to 1 ratio would pay if it attracted enough business. Whether it would do this or not was a matter of judgment based on somewhat conflicting opinions of witnesses who testified at the hearing. There was substantial evidence (1) that the 2 to 1 ratio was unreasonably high, (2) that the 1½ to 1 ratio was just and reasonable.

The arguments of the plaintiff to show that the 1½ to 1 ratio is unfair and unreasonable are not persuasive.

■ There was substantial evidence that little would be gained by eliminating urgent service because the cost of "tislines" (or private wires) and certain extra employes, which the plaintiff attributes almost entirely to urgent service, would have to continue even if the urgent service should be discontinued, likewise that the reduction of rates for urgent service would result in their increased use. While an increase of business in urgent messages due to a lower rate is necessarily a matter of inference, we think the inference is a reasonable one under the circumstances. As a matter of common knowledge a reduction in railroad rates by the Interstate Commerce Commission has frequently resulted in increased business as well as profits. The effect of a reduction of rates upon a utility is always a diffi-

cult matter to forecast and the judgment of the Commission, whose business it is to study and resolve the problem, should have great weight. Moreover, even if a smaller profit should be realized on urgent messages under the ratio prescribed than under the 2 to 1 ratio, it by no means follows that the smaller profit would be an unjust burden on the rest of the business. A carrier does not have a constitutional right to any specified rate of return on a particular class of service so long as it is not denied a fair return on its business as a whole. Northern Pac. Ry. v. North Dakota, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann. Cas.1916A, 1.

■ The plaintiff further contends that the Commission should not have denied its petition for a rehearing, which was based on changed conditions resulting from the European War. It did not file the petition until after the Commission had rendered its decision on the merits on April 9, 1941. Prior to that time, it had relied on the record before the Commission, though the hearings had ended two years before. Already the European War had been going on since September, 1939, France had fallen in June, 1940, and war conditions had existed in many parts of the world for months. When the application for a rehearing was made, there was no condition calling for the submission of further testimony which had not existed for a long time. Plaintiff's delay in bringing the matter to the attention of the Commission justified the denial of its application. United States v. Northern Pacific Ry., 288 U.S. 490, 494, 53 S.Ct. 406, 77 L. Ed. 914.

■ Moreover, the petition for a rehearing merely alleged that world conditions had changed and that the demand for urgent messages which had formerly related to business in securities, arbitrage, and foreign exchange had been displaced by one for messages growing out of war conditions and covering widely spread areas. It did not show how this change affects or will affect the charges for urgent messages, other than by making it more difficult to modify the 2 to 1 ratio by agreement. Under § 405 of the Communications Act, 47 U.S.C.A. § 405, the authority to grant a rehearing is discretionary with the Commission and we find no showing that the discretion was abused.

For the foregoing reasons, we hold that the plaintiff failed to establish a cause of action and that a decree should pass dismissing the complaint, dissolving the preliminary injunction and distributing the reserve established herein pursuant to an appropriate order.

Submit proposed decree and findings. The latter are only for the aid of the court and are to form no part of the record.