166 F.3d 1224
 334 U.S.App.D.C. 261, 14 Communications Reg.
(P&F) 1060
 CABLE & WIRELESS P.L.C., Petitioner
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents
Sprint Corporation, et al., Intervenors
 Nos. 97-1612, 97-1613, 97-1614, 97-1615, 97-1620,
97-1621,97-1640, 97-1643, 97-1652, 97-1655.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 23, 1998.
Decided Jan. 12, 1999.
 
 Philip V. Permut argued the cause for petitioners Cable & Wireless, P.L.C., et al. Clifford M. Sloan argued the cause for petitioners GTE Service Corporation, et al. With them on the joint briefs were Robert J. Aamoth, R. Michael Senkowski, M. Edward Whelan, III, Gail L. Polivy, Gregory C. Staple, R. Edward Price, Jonathan Jacob Nadler, Kenneth S. Geller and Erika Z. Jones. Donald M. Falk, Harold S. Reeves and Joan M. Griffin entered appearances.
 Alan Y. Naftalin, Gregory C. Staple and R. Edward Price were on the briefs for petitioner Telstra Corporation Limited.
 Joel Marcus, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert J. Wiggers and Robert B. Nicholson, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and John E. Ingle, Deputy Associate General Counsel.
 David W. Carpenter argued the cause for intervenors AT&T Corporation, et al. With him on the brief were Gene C. Schaerr, Mark C. Rosenblum, James J.R. Talbot, Ann M. Kappler, Matthew B. Pachman, Leon M. Kestenbaum, H. Richard Juhnke and Robert S. Koppel. Ann J. LaFrance and John M. Scorce entered appearances.
 Philip V. Permut, Robert J. Aamoth, Raul R. Rodriguez, Jeffrey P. Cunard and Lothar A. Kneifel were on the principal joint brief of intervenors from developed and developing countries. Joan M. Griffin entered an appearance.
 Philip V. Permut, Robert J. Aamoth and Jonathan Jacob Nadler were on the joint brief of intervenors from developing countries. Joan M. Griffin entered an appearance.
 Before: RANDOLPH and TATEL, Circuit Judges and BUCKLEY, Senior Circuit Judge.
 TATEL, Circuit Judge:
 
 
 1
 In order to strengthen the bargaining position of domestic telecommunications companies in negotiations with their foreign counterparts over the price of completing international long-distance calls, the Federal Communications Commission issued an Order prohibiting U.S. companies from paying more than certain benchmark rates for such "termination" services. Petitioners, a group of foreign telecommunications companies, claim that the Commission lacks authority to issue the Order and that the benchmark rates are unreasonable. Rejecting petitioners' argument that the Order directly regulates foreign carriers as well as their alternative argument that it unlawfully regulates domestic carriers, we hold that the Order was a valid exercise of the Commission's regulatory authority under the Communications Act. We also hold that because the record shows that the Commission justified its method for calculating rates, and because petitioners failed to demonstrate that the rates do not adequately compensate foreign carriers for providing termination services, the Order was neither unsupported by substantial evidence nor arbitrary or capricious. Rejecting petitioners' other challenges, we uphold the Order in its entirety.
 
 
 2
 * Completion of international telephone calls requires the cooperation of several telephone companies in different countries. When a U.S. caller places a call to Japan, for example, the call is first connected to a local telephone company, such as Bell Atlantic, which then passes it to a domestic long-distance carrier, such as AT&T or MCI, which in turn passes it to a Japanese telephone company, which then completes or "terminates" the call to its recipient. The foreign carrier terminates the call pursuant to an operating agreement with the domestic carrier. The operating agreement contains an "accounting rate," which is the price the two telephone companies have negotiated for handling each minute of international long-distance service. The FCC requires the two carriers to divide the accounting rate evenly; each carrier's share of the accounting rate is called the "settlement rate." For example, if the accounting rate between a U.S. carrier and a Japanese carrier is $1 per minute, the U.S. carrier would pay the Japanese carrier a settlement rate of $0.50 per minute to terminate calls from the United States to Japan. Likewise, the Japanese carrier would pay the U.S. carrier $0.50 per minute for each call originating in Japan and terminating in the United States.
 
 
 3
 Instead of paying each other every time a call is made, domestic and foreign telephone companies make payments at scheduled times on an aggregate net basis. Suppose in our example that during a specified settlement period, U.S. callers make 500 minutes of calls to Japan, while Japanese callers make 300 minutes of calls to the United States. Because there are 200 minutes of net calling outflow from the United States to Japan, U.S. carriers will make a net settlement payment to their foreign counterparts of $100 ($0.50 per minute times 200 minutes). The calling outflow from the United States to all foreign countries except for Canada and Cuba typically exceeds the amount of traffic going the other direction. Thus, in the aggregate, net settlement payments consistently run from U.S. carriers to foreign carriers.
 
 
 4
 Although the U.S. telecommunications industry has become more competitive, the industry remains non-competitive in much of the rest of the world. This competitive differential has two important consequences for this case. First, in negotiating settlement rates, foreign monopoly carriers can pit competing U.S. carriers against one another, exploiting the fact that U.S. carriers unwilling to pay settlement rates demanded by foreign carriers will lose business on those routes to higher-bidding domestic competitors. Known as "whipsawing," this practice drives up the price of termination services to levels that exceed not only actual costs, but also the price that foreign carriers charge their own subscribers for comparable local services. Through excessive net settlement payments to foreign carriers, U.S. carriers and their U.S. customers effectively subsidize government-owned telephone services in foreign countries. The Commission estimates that in 1996, 70% of the $5.4 billion in total U.S. settlement payments, or $3.78 billion, represented an above-cost subsidy from U.S. consumers to foreign carriers.
 
 
 5
 Second, foreign carriers with U.S. affiliates can use their monopoly power to distort competition in the United States. This occurs when a foreign carrier and its U.S. affiliate act together as an integrated firm, competing in the U.S. market as a provider of international long-distance services while serving as a monopoly supplier of a necessary input, i.e., termination services in the foreign country. By extracting above-cost settlement rates from U.S. carriers, the foreign carrier enables its U.S. affiliate to undercut its competitors, since the above-cost portion of the settlement rate is essentially an internal transfer for the foreign-affiliated U.S. carrier; for other competitors, it represents a real cost. Economically, this "price squeeze" behavior has the same effect as if the foreign carrier engaged in price discrimination by charging its U.S. affiliate a lower settlement rate than it charged all other U.S. carriers.
 
 
 6
 The FCC has long sought to protect U.S. carriers and U.S. consumers from the monopoly power wielded by foreign telephone companies in the international telecommunications market. In 1980, the Commission adopted a Uniform Settlements Policy, requiring that all domestic carriers on a given international route establish the same accounting rate with the foreign correspondent, that all settlement rates equal 50% of accounting rates, and that each domestic carrier carry incoming traffic on the route in proportion to its share of outgoing traffic. See Uniform Settlement Rates on Parallel International Communications Routes, 84 F.C.C.2d 121 (1980). Although this policy initially applied only to international telegraph and telex services, the Commission extended it to international telephone service in 1986. See Common Carrier Services; Implementation and Scope of the Uniform Settlements Policy, 51 Fed.Reg. 4736 (1986). These measures helped prevent foreign carriers from whipsawing competing U.S. carriers. But because they did not deter foreign carriers from charging above-cost settlement rates, the Commission issued further orders encouraging domestic carriers to negotiate cost-based settlement rates. See Regulation of International Accounting Rates, 6 F.C.C.R. 3552, 3552 p 1 (1991) (report & order) (adopting "procedural reforms that remove any U.S. regulatory impediments to lower, more economically efficient, cost-based international accounting rates"); Regulation of International Accounting Rates, 7 F.C.C.R. 8040 (1992) (second report & order) (setting voluntary benchmark settlement rates).
 
 
 7
 In 1997, finding that its efforts to date had not driven settlement rates to cost-based levels, the Commission issued the Order challenged here, mandating the maximum settlement rates that U.S. carriers may pay to their foreign counterparts. See International Settlement Rates, 12 F.C.C.R. 19,806 (1997) (report & order). According to the Commission, its primary concern in issuing the Order was "not ... the absolute level of U.S. net settlement payments per se or the contribution of settlement payments to the U.S. trade deficit," but rather "the extent to which those payments reflect rates that substantially exceed the underlying costs of providing international termination services." Id. at 19,822-23 p 36. "[A]bove-cost settlement rates," the FCC explained, "contribute to the inflated rates paid by U.S. consumers for international services, create the potential for competitive distortions in the U.S. market for [international telephone service], and produce inefficiencies in the global telecommunications market." Id. at 19,823 p 36. While acknowledging that "changing market conditions have ... helped to reduce settlement rates," the Commission determined that "[m]onopoly conditions prevail in most [foreign countries]" and that benchmark rates are necessary to ensure "reduc[tion] [of] settlement rates on a timely basis to a more cost-based level." Id. at 19,824-25 p 39.
 
 
 8
 Under the FCC's Order, the settlement rates negotiated by U.S. carriers may not exceed $0.15 per minute for foreign carriers in upper income nations (per capita GNP of $8,956 or more), $0.19 per minute for foreign carriers in middle income nations (per capita GNP between $726 and $8,955), and $0.23 per minute for foreign carriers in lower income nations (per capita GNP of less than $726). See id. at 19,850 p 90, 19,860-61 p 111. Unable to obtain actual termination cost data from foreign carriers, the Commission calculated these benchmark rates using a "tariffed components price" methodology, which adds together estimated prices for three services--international transmission, international switching, and national extension--necessary to complete international long-distance calls. See id. at 19,827-50 pp 45-89. According to the FCC, the benchmarks "are substantially below most prevailing settlement rates and represent progress toward achieving cost-based rates." Id. at 19,827 p 44. At the same time, the Commission claims, the rates are high enough to compensate foreign carriers for their termination costs. See id. If not, "any carrier may ask [the Commission] to reconsider, in a specific case, the benchmarks on the grounds that they do not permit the carrier to recover [its costs]." Id. at 19,842 p 74. The Order allows U.S. carriers to achieve compliance with the benchmark rates over a transition period of one to four years, depending on the per capita income of the foreign country in which the negotiating foreign carrier operates. See id. at 19,885 p 165.
 
 
 9
 The Order also contains special provisions applicable only to foreign-affiliated U.S. carriers. Under existing FCC rules, "a U.S. carrier is considered to be affiliated with a foreign carrier when a foreign carrier owns a greater than twenty-five percent interest in, or controls, the U.S. carrier." Id. at 19,901 n. 358 (citing 47 C.F.R. § 63.18(h)(1)(i) (1997)). In order to prevent such carriers from engaging in price squeeze behavior, the Order requires them to comply immediately with the benchmarks as a condition of obtaining approval to provide international long-distance service to the affiliated country. See id. at 19,901 p 207.
 
 
 10
 Petitioners, various parties representing over 100 foreign governments, regulators, and telecommunications companies, challenge the Order on several grounds. First and foremost, they claim that the FCC, by limiting the settlement rates that foreign carriers may charge U.S. carriers, has asserted extraterritorial jurisdiction over foreign carriers and foreign telecommunications services, thereby exceeding its authority under the Communications Act and the International Telecommunications Union Treaty. Petitioners further argue that even if the Order does not regulate foreign carriers, it unlawfully regulates domestic carriers by restricting the prices they may pay to non-FCC-regulated entities. Petitioners also argue that the benchmark settlement rates are arbitrary, capricious, and unsupported by substantial evidence, and that the Commission's restrictions on foreign-affiliated U.S. carriers are unlawfully discriminatory and inadequately justified. Finally, a single petitioner, Telstra Corporation, contends that the FCC violated the Administrative Procedure Act by failing to respond to comments urging the Commission to curb allegedly anti-competitive practices of U.S. carriers in providing Internet-related telecommunication services. We take up each claim in turn.
 
 II
 
 11
 We begin with petitioners' complaint that the FCC's Order unlawfully asserts regulatory authority over foreign telecommunications services and foreign carriers wishing to serve the U.S. market. According to petitioners, the Commission issued the Order to force foreign carriers to reduce their settlement rates. Because "it is clearly within the interest of a U.S. international carrier to negotiate rates at or below the relevant benchmark," 12 F.C.C.R. at 19,894 p 186, petitioners argue, it is implausible to characterize the Order as imposing any regulatory burdens on domestic carriers. Petitioners point to the FCC's enforcement scheme as confirmation that the Order directly regulates foreign carriers. "When a foreign [carrier] fails to respond to a U.S. international carrier's efforts to achieve a settlement rate that complies with the [benchmarks]," the Order permits the domestic carrier to file a petition with the FCC "request[ing] enforcement measures." Id. The complaining U.S. carrier must serve its petition on the uncooperative foreign carrier, which then has 35 days to respond. See id. These procedures, petitioners argue, effectively treat foreign carriers as defendants in a lawsuit, exposing them to enforcement actions that would directly or indirectly compel them to accept lower settlement rates.
 
 
 12
 The Communications Act authorizes the Commission to regulate "foreign telecommunications." See 47 U.S.C. §§ 152(a), 201. The Commission claims no authority to directly regulate foreign carriers. See 12 F.C.C.R. at 19,951 p 312 ("We at no time in this Order assert that we have the authority to compel directly a foreign carrier to charge a certain rate for terminating U.S.-originated traffic."). Instead, the Commission explained that "the rules we adopt here apply only to the settlement rates that carriers subject to our jurisdiction may pay for termination of U.S.-originated traffic." Id. Since neither the statute nor legislative history makes clear whether the Commission regulates domestic or foreign carriers when it prescribes settlement rates, we must sustain the Commission's view as long as the Order reasonably represents an exercise of its statutory authority to regulate domestic carriers engaged in foreign telecommunications. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 13
 We recognize that regulating what domestic carriers may pay and regulating what foreign carriers may charge appear to be opposite sides of the same coin. But by focusing only on the Order's effects on foreign carriers, petitioners overlook the crucial economic reality that makes the Commission's position that it is only regulating domestic carriers: Because domestic carriers operate in a competitive market, they face a dilemma when they bargain with monopolist foreign carriers. As a group, U.S. carriers would be best off if each decided not to accept settlement rates higher than FCC benchmarks. But if one U.S. carrier maintained this position to the point of impasse in negotiations with a foreign carrier, a competing U.S. carrier would make the foreign carrier a higher offer. As the intervenors on behalf of the FCC explain, the Order "requir[es] domestic carriers to take 'a unified bargaining position,' and thereby prevent[s] each carrier from acting in its own self-interest." Intervenors' Br. at 15 (quoting Atlantic Tele-Network, Inc. v. FCC, 59 F.3d 1384, 1386 (D.C.Cir.1995)). Indeed, contrary to petitioners' claim that the enforcement scheme targets foreign carriers, the Order authorizes "enforcement measures ... to ensure that no U.S. carrier pays that foreign correspondent an amount exceeding the lawful settlement rate benchmark." 12 F.C.C.R. at 19,894 p 186 (emphasis added). Far from threatening foreign carriers with enforcement actions, the Order at most states that the FCC will contact "responsible [foreign] government authorities" to "seek their support in lowering settlement rates." Id. at 19,893 p 185. Given the structure of the global telecommunications industry and its resulting incentives, we find reasonable the Commission's view that the Order regulates domestic carriers, not foreign carriers.
 
 
 14
 To be sure, the practical effect of the Order will be to reduce settlement rates charged by foreign carriers. But the Commission does not exceed its authority simply because a regulatory action has extraterritorial consequences. See Radio Television S.A. de C.V. v. FCC, 130 F.3d 1078, 1082 (D.C.Cir.1997); R. C. A. Communications, Inc. v. United States, 43 F.Supp. 851, 854-55 (S.D.N.Y.1942); In re Mackay Radio & Telegraph Co., 2 F.C.C. 592, 598-99 (1936). Indeed, no canon of administrative law requires us to view the regulatory scope of agency actions in terms of their practical or even foreseeable effects. Otherwise, we would have to conclude, for example, that the Environmental Protection Agency regulates the automobile industry when it requires states and localities to comply with national ambient air quality standards, or that the Department of Commerce regulates foreign manufacturers when it collects tariffs on foreign-made goods.
 
 
 15
 We thus hold that the Commission's Order does not regulate foreign carriers or foreign telecommunications services and therefore does not violate the Communications Act. For the same reason, we reject petitioners' claim that the Order violates the doctrine of "half-circuit jurisdiction," which allows the Commission to exercise jurisdiction over international calls only from a point within the United States to the midpoint between the United States and the foreign country. By capping the amount that U.S. carriers may pay for foreign termination services, the Commission has not thereby regulated those services.
 
 
 16
 Nor does the Order violate the International Telecommunications Union Treaty regime, International Telecommunications Regulations, S. Treaty Doc. 102-13 (Melbourne 1988). Although the treaty provides that carriers "shall by mutual agreement establish and revise accounting rates to be applied between them," id. § 6.2.1; see id. § 1.5 (same), a separate provision "recognize[s] the right of any member, subject to national law ..., to require that administrations and private operating agencies, which operate in its territory and provide an international telecommunication service to the public, be authorized by that member," id. § 1.7(a). We agree with the Commission that "[t]he right to authorize a carrier to provide service in a given country necessarily includes the right to attach reasonable conditions to such authorization" to safeguard the public interest. 12 F.C.C.R. at 19,950 p 311. Indeed, the treaty's preamble makes clear that "it is the sovereign right of each country to regulate its telecommunications." ITU Regulations (preamble).
 
 
 17
 Petitioners contend that the Order frustrates international comity because it subjects foreign carriers to conflicting obligations if their governments prescribe minimum settlement rates that exceed the maximum rates allowed by the FCC. But since no foreign carrier in this litigation has complained that it actually faces such a predicament, we see no need to decide whether the Order would be valid in such circumstances. In any event, we note that during the rulemaking process, both the U.S. Department of State and the U.S. Trade Representative filed comments supporting the Order.III
 
 
 18
 Having concluded that the Order regulates domestic carriers, not foreign carriers, we turn to petitioners' alternative claim that the Commission lacks authority to set the prices that U.S. carriers may pay to foreign carriers for termination services. According to petitioners, the Communications Act allows the Commission to regulate only the terms on which U.S. carriers offer telecommunication services to the public (including retail rates), not the prices U.S. carriers pay to non-FCC-regulated entities for goods and services. We disagree.
 
 
 19
 At least three provisions of the Communications Act authorize the FCC to regulate the settlement rates that U.S. carriers pay to foreign carriers. First, section 201 provides:
 
 
 20
 (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; ....
 
 
 21
 (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful.... The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.
 
 
 22
 47 U.S.C. § 201 (1994). "Foreign communication" means "communication or transmission from or to any place in the United States to or from a foreign country...." Id. § 153(17). Petitioners say that section 201(b), when read together with section 201(a), covers only the rates, terms, and conditions on which U.S. carriers furnish foreign communication service to their customers. We discern no such limitation in the statute's text. The statute nowhere defines the "practices ... in connection with" foreign communication service covered by section 201(b), and the Commission has interpreted such "practices" to encompass negotiation and payment of settlement rates by U.S. carriers. See 12 F.C.C.R. at 19,937 p 283. Because the Commission's interpretation is reasonable, we uphold it under Chevron's second step. See 467 U.S. at 843, 104 S.Ct. 2778.
 
 
 23
 The second relevant provision of the statute, section 205(a), provides:
 
 
 24
 Whenever, after full opportunity for a hearing, upon a complaint or under an order for investigation and hearing made by the Commission on its own initiative, the Commission shall be of opinion that any charge, classification, regulation, or practice of any carrier or carriers is or will be in violation of [the Act], the Commission is authorized and empowered to determine and prescribe what will be the just and reasonable charge or the maximum or minimum, or maximum and minimum, charge or charges to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed....
 
 
 25
 47 U.S.C. § 205(a). The Commission may declare a practice unlawful upon finding that it is "unjust, unreasonable, unduly discriminatory, or preferential." Western Union Telegraph Co. v. FCC, 815 F.2d 1495, 1501 n. 2 (D.C.Cir.1987). Here, because the Commission determined that "it would be an unjust and unreasonable 'practice' ... for a U.S. international carrier to pay settlement rates above the relevant benchmark rate," 12 F.C.C.R. at 19,941 p 291, it set enforceable benchmark rates. Deferring to the Commission's determinations of what practices are "just" or "unjust," "reasonable" or "unreasonable," see Capital Network System, Inc. v. FCC, 28 F.3d 201, 204 (D.C.Cir.1994), we hold that the Commission, in capping settlement rates, lawfully exercised its broad powers under section 205(a).
 
 
 26
 Finally, section 211(a) also gives the Commission authority to regulate settlement rates. It requires "[e]very carrier subject to this chapter [to] file with the Commission copies of all contracts, agreements, or arrangements ... with common carriers not subject to the [Act]." 47 U.S.C. § 211(a). For all contracts filed with the FCC, it is well-established that "the Commission has the power to prescribe a change in contract rates when it finds them to be unlawful and to modify other provisions of private contracts when necessary to serve the public interest." Western Union, 815 F.2d at 1501 (citing Federal Power Comm'n v. Sierra Pacific Power Co., 350 U.S. 348, 353-55, 76 S.Ct. 368, 100 L.Ed. 388 (1956), and United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 344, 76 S.Ct. 373, 100 L.Ed. 373 (1956)). According to petitioners, section 211(a)'s filing requirement for agreements with "common carriers not subject to the [Act]" applies only to agreements between U.S. telecommunications companies and other U.S. carriers not engaged in telecommunications, such as railroads. But neither the statute nor any of the legislative history cited by petitioners, see H.R. REP. NO. 73-1850, at 5 (1934), indicates that Congress intended the phrase "common carriers not subject to the [Act]" to refer just to other domestic carriers. Instead, the statute leaves this phrase open to interpretation, and in our view, the Commission has reasonably construed section 211(a) to apply to settlement rate agreements between U.S. carriers and foreign carriers. Under the Sierra-Mobile doctrine, the Commission may modify such agreements as it deems necessary to serve the public interest. See 12 F.C.C.R. at 19,939 p 286 (finding settlement rates exceeding the benchmarks "not in the public interest"). Giving Chevron deference to the Commission's interpretation of section 211(a) and "substantial deference" to its judgments regarding the public interest, Mobile Communications Corp. of America v. FCC, 77 F.3d 1399, 1406 (D.C.Cir.1996), we hold that the Commission had ample authority under section 211(a) to limit settlement rates paid by U.S. carriers.
 
 
 27
 Petitioners cite various authorities, see R.C.A., 43 F.Supp. at 854-55; Separation of Costs of Regulated Telephone Service from Costs of Nonregulated Activities, 2 F.C.C.R. 1298, 1312 (1987) (report & order); AT&T Charges for Interstate Telephone Service, 64 F.C.C.2d 1, 80 (1977) (final decision & order), for the proposition that the FCC cannot set prices that U.S. carriers pay to non-FCC-regulated suppliers of goods and services. To be sure, in those cases the Commission sought to lower prices paid by U.S. carriers for goods or services not by regulating those prices directly, but by regulating retail rates ultimately paid by consumers. But nothing in those cases suggests that the Commission lacked authority to regulate such prices directly; they simply never addressed the issue. Given the expansive powers delegated to the Commission under sections 201(b), 205(a), and 211(a), we have no doubt that the Commission has authority to prescribe maximum settlement rates.
 
 IV
 
 28
 We next consider petitioners' claim that the Commission's settlement rate prescriptions violate the Administrative Procedure Act, 5 U.S.C. § 706 (1994). Using a "tariffed components price" ("TCP") methodology, the Commission calculated its benchmark rates by summing the estimated prices for three services--international transmission, international switching, and national extension--necessary for terminating an international long-distance call. See 12 F.C.C.R. at 19,827-30 pp 45-50. Arguing that the TCP methodology fails to produce cost-based settlement rates because it does not use data on the actual cost of foreign termination services, petitioners claim that the calculated rates undercompensate foreign carriers. Petitioners further allege that in making its calculations, the Commission relied on non-record data. Again, we disagree.
 
 
 29
 As we read the record of these proceedings, the Commission meticulously documented and carefully considered a wide range of public comments concerning the TCP methodology. See id. at 19,830-50 pp 51-89. The final Order contains several passages explaining why the method more than fully compensates foreign carriers. See, e.g., id. at 19,840-41 p 70 (noting that TCP method includes costs, such as "uncollectible billings, general overhead expenses associated with retail service, and marketing and commercial expenses," that would not be included in cost-based settlement rates); id. at 19,841 p 71 (noting that data used to price international switching "is substantially above cost"); id. at 19,845 p 80 (noting that benchmark rates assume higher switching costs for developing countries, despite lack of evidence that such costs are actually higher in developing countries).
 
 
 30
 Throughout the rulemaking process, moreover, petitioners withheld the very cost data that would have enabled the Commission to establish precise, cost-based rates. In its published notice proposing the TCP methodology, the Commission repeatedly invited commenters to suggest alternative methods for calculating settlement rates. See International Settlement Rates, 12 F.C.C.R. 6184, 6200-07 pp 39, 43, 44, 46-50, 52-56 (1996) (notice of proposed rulemaking). At one point, agreeing with petitioners' view that "the appropriate cost standard for establishing benchmark settlement rates is the incremental cost of terminating international traffic," id. at 6204 p 50, the Commission explicitly stated: "We encourage foreign and U.S. carriers to submit data on their costs." Id. at 6205 p 52. Yet in its final rule, the Commission reported that "no commenter has provided cost data in the record about the costs of providing international termination services." 12 F.C.C.R. at 19,827 p 42; see id. at 19,830-31 p 51 (noting "the dilemma ... that, on the one hand, settlement agreements should contain settlement rates that are cost-based, but on the other, the data necessary to calculate costs for each foreign carrier are not available"). Since petitioners refused to let the Commission see their cost data, and since the Commission thoroughly explained why "the TCP methodology provides a reasonable basis for establishing settlement rate benchmarks in the absence of carrier-specific cost data," id. at 19,839 p 66, we have no firm basis for accepting petitioners' claim that the benchmark rates are not fully compensatory.
 
 
 31
 Petitioners allege that some foreign countries did provide data showing that the prescribed rates would be below cost, citing Hong Kong as an example. The Commission's Order assigns Hong Kong's international carrier, HKTI, a settlement rate of $0.15 per minute--a rate which, according to petitioners, cannot possibly compensate HKTI for the $0.29 per minute government-mandated charge that it must pay Hong Kong's local carrier for terminating each incoming international call. But according to the intervenors on behalf of the FCC, HKTI is a wholly owned subsidiary of Hong Kong Telecom, and Hong Kong Telecom owns Hong Kong Telephone Company, the monopoly provider of local service in Hong Kong. The $0.29 per minute charge is therefore simply a "left pocket-right pocket" transaction between two subsidiaries of the same company. Intervenors' Br. at 31. Asked about this at oral argument, petitioners had no response.
 
 
 32
 In any case, if HKTI or another foreign carrier could credibly show that the benchmark rates prohibit it from fully recovering its termination costs, the Order specifically allows such a carrier to ask the Commission to adjust the relevant rate to better reflect actual costs. See 12 F.C.C.R. at 19,842 p 74, 19,848 p 85, 19,849-50 pp 88-89. Recognizing the proprietary nature of foreign carrier cost data, the Order makes clear that "under the Commission's rules, a party may request confidential treatment of any cost data it submits to justify a different settlement rate benchmark." Id. at 19,850 p 89 (citing 47 C.F.R. § 0.459 (1997)). In the absence of record evidence showing that the benchmark rates systematically undercompensate foreign carriers, we think the Commission's regulatory approach--prescribing general rules while allowing for exceptions--is not arbitrary or capricious.
 
 
 33
 Turning to petitioners' claim that the Commission used non-record data to set the benchmark rates, we first consider their allegation that the Commission used U.S. outgoing call distribution data provided by AT&T on a confidential basis to calculate country-by-country prices for national extension services (one of the three TCP components) and then returned the data to AT&T without affording the parties an opportunity to review it. The record shows, however, that the Commission made summaries of the AT&T data available under seal for a two-week period prior to issuing its final Order, that it refused to lengthen the comment period on the grounds that the data was concise and easy to understand, and that at least one party submitted comments criticizing the Commission's reliance on the data. See id. at 19,846-47 pp 83-84 & nn.138-43. During the rulemaking proceeding, moreover, petitioners never challenged the Commission's confidential treatment of the data, nor did they contest the Commission's refusal to extend the comment period. Complaining only that the summary data contained no underlying figures or assumptions, they argued that it was impossible to verify the national extension prices calculated by the Commission. The Commission disagreed, stating in its Order that "the data is complete" and that "[t]here is no further data that the [FCC] relied upon to calculate the national extension TCPs that is not in the record." Id. at 19,847 p 84. Instead of summoning and sorting through AT&T's confidential data to resolve this issue, we simply note that foreign carriers had in their hands all the incoming call distribution data they needed to contest the accuracy of the Commission's calculated price for national extension services. In other words, even if the Commission's handling of the AT&T data was less than ideal, it did not impair the ability of foreign carriers to challenge the national extension component of the benchmark rates.
 
 
 34
 We think the same logic refutes petitioners' claim that in calculating international switching costs, the Commission unreasonably relied on a study published by the International Telecommunications Union (the TEUREM study) without examining its underlying data and assumptions. Although the data was unavailable to the Commission and the public, foreign carriers had access to data about their own switching costs and therefore did not lack the means to challenge the switching costs calculated by the Commission. Furthermore, as far as compensating foreign carriers is concerned, we believe the Commission reasonably relied on the TEUREM study in light of the fact that the Commission had other evidence indicating that the study substantially overestimated switching costs. See id. at 19,845 p 80.
 
 V
 
 35
 Next, we consider petitioners' objections to the conditions imposed on new entrants into the U.S. telecommunications market that have a 25% equity affiliation with a foreign carrier. To deter price squeeze behavior, the Order requires foreign-affiliated U.S. carriers to comply immediately with the benchmark settlement rates in order to obtain section 214 permission to provide international service to the affiliated country. See id. at 19,901 p 207. In contrast, the Order gives non-foreign-affiliated U.S. carriers a transition period of one to four years (depending on the per capita income of the foreign country) to achieve compliance. See id. at 19,885 p 165.
 
 
 36
 According to petitioners, the section 214 conditions represent an inadequately explained change in the Commission's regulatory policy. While it is true that the Commission in 1995 declined to impose similar conditions on foreign-affiliated carriers seeking to enter the U.S. market, see Market Entry and Regulation of Foreign-Affiliated Entities, 11 F.C.C.R. 3873, 3898-99 pp 65-70 (1995) (report & order), we think the Commission adequately justified its policy shift in the 1997 Order. In 1995, the Commission believed that section 214 conditions were unnecessary because the "effective competitive opportunities" test, which requires foreign-affiliated market entrants to show that the foreign country has taken sufficient steps to create a competitive international market, served to reduce the monopolist leverage essential for price squeeze behavior. See id. at 3881-94 pp 19-55. By 1997, the Commission observed, at least two things had changed. First, because the United States had committed to allowing foreign competitors freer entry into the U.S. market pursuant to the World Trade Organization Basic Telecom Agreement of February 1997, the Commission had proposed eliminating the effective competitive opportunities test. See 12 F.C.C.R. at 19,905 p 218, 19,908 p 223 (citing Foreign Participation in the U.S. Telecommunications Market, 12 F.C.C.R. 7847, 7861 p 32 (1997) (order & notice of proposed rulemaking)). Second, despite the Commission's expectation that increased global competition would drive rates toward cost-based levels, see id. at 19,905 p 217; 11 F.C.C.R. at 3899 p 71, "settlement rates remain[ed] far above cost-based levels," 12 F.C.C.R. at 19,905 p 218. In light of these changed conditions, we think the Commission reasonably adopted its current section 214 authorization policy to deal with the heightened risk of price squeeze behavior.
 
 
 37
 Petitioners' remaining challenges require little discussion. They claim that the immediate compliance requirement discriminates against foreign-affiliated U.S. carriers compared to non-foreign-affiliated carriers, but we see no grounds for disturbing the Commission's informed judgment that the risk of price squeeze behavior presents a timely problem requiring immediate preventive measures. See id. at 19,905 p 218. Nor is there merit to petitioners' claim that a 25% equity affiliation does not indicate common control and is therefore an arbitrary proxy for anti-competitive threats. Not only did petitioners fail to raise this issue during the rulemaking process, but the Commission has reasonably adhered to its established view that "a less-than-controlling [ownership] interest can provide a carrier with the incentive and ability to engage in anticompetitive conduct" 11 F.C.C.R. at 3903 p 80.
 
 
 38
 Finally, petitioners challenge the Order's penalty provision under which foreign-affiliated carriers found to engage in price squeeze behavior may be required to lower their settlement rates on the affiliated routes to the "best practice rate," i.e., the lowest settlement rate between the United States and any foreign country (currently $0.08 per minute). See 12 F.C.C.R. at 19,908 p 224. According to petitioners, this provision discriminates against foreign-affiliated U.S. carriers because it does not apply to non-foreign-affiliated carriers that fail to comply with the benchmark rates. But the penalty's purpose is to deter anti-competitive conduct, and nothing in the record suggests that non-foreign-affiliated carriers have an incentive to engage in anti-competitive conduct. Petitioners' further claim that the "best practice rate" undercompensates foreign carriers likewise misses the mark. Because the penalty rate is meant to deter and punish anti-competitive conduct, we find it neither surprising nor unreasonable that it undercompensates foreign carriers.
 
 VI
 
 39
 This brings us finally to petitioner Telstra's claim that, in the course of prescribing international settlement rates, the Commission should have set rates for Internet-related telecommunication services. An Australian carrier, Telstra exchanges both telephone and Internet traffic with U.S. carriers. Although it receives net payments from U.S. carriers for terminating telephone calls from the United States to Australia, it makes net payments to U.S. carriers for terminating Internet traffic from Australia to the United States. Telstra alleges that U.S. carriers charge above-cost rates for terminating Internet traffic and that the Commission ignored its comments urging a reduction in these rates. Claiming that the Commission had invited comments during the rulemaking process and that Telstra's comments were directly relevant to the issues decided in the final Order, Telstra accuses the Commission of violating the Administrative Procedure Act, 5 U.S.C. § 553(c). We disagree.
 
 
 40
 The Commission's notice of proposed rulemaking gives no indication that the agency sought comments on Internet-related issues. The paragraph cited by Telstra in support of its position reads:
 
 
 41
 We invite interested parties to submit comments on our proposals for revising the benchmark settlement rates, including the methodology for calculating the rates and our proposal for periodic revisions to the rates. We also invite comments on our plan to implement the revised benchmark settlement rates in a manner that will promote our goal of achieving the cost-oriented, nondiscriminatory, transparent settlement rates necessary for the development of competition in the global telecommunications services market.
 
 
 42
 12 F.C.C.R. at 6195 p 29. Although it may be true, as Telstra says, that "the global telecommunications services market" includes Internet services, the Commission's request for comments occurred in the context of a notice that--from the very first paragraph--declares its subject to be "benchmark settlement rates for international message telephone service (IMTS) between the United States and other countries." Id. at 6185 p 1 (emphasis added). The notice made clear that the Commission sought to regulate the provision of ordinary telephone service under "the traditional accounting rate system," id., and that Internet traffic "is exchanged outside of the traditional accounting rate system," id. at 6189 p 13. The mere fact that Internet traffic and international voice traffic are becoming increasingly interconnected does not oblige the Commission to regulate both spheres of telecommunications services simultaneously.
 
 VII
 
 43
 We deny the petition for review and affirm the Commission's Order in all respects.
 
 
 44
 So ordered.